51 P.3d 544 (2002)
2002 OK 9
In the MATTER OF BABY GIRL L.
S.C., Appellee,
v.
J.L., Defendant, and
D.M. and B.M. Putative Adoptive Parents, Appellants.
No. 96,158.
Supreme Court of Oklahoma.
February 12, 2002.
As Modified on Grant of Rehearing July 1, 2002.
John Terry Bado, Barbara K. Bado, Bado & Bado, Edmond, for Appellants.
Gary Taylor and Stan Foster, Oklahoma City, Richard C. Lerblance, Hartshorne, for Appellee.
*548 SUMMERS, J.
¶ 1 This is a custody dispute between a married couple desiring to adopt, who have had custody of an infant child since a month after her birth, and the child's unmarried natural father, who has sought custody during that time. The adoption failed by reason of (1) the father's refusal to consent (the natural mother originally gave her consent) and (2) in an earlier appellate case relating to this child, the Court of Civil Appeals (COCA), Div 2, in In the Matter of Baby Girl L., Case No. 92003 (not for pub., 5-18-99), cert. denied (Okla. S. Ct., 9-20-99), ruled father's parental rights were improperly terminated by the Oklahoma County district court and his consent was necessary for the adoption.
¶ 2 At issue is whether the trial court should have, once the adoption failed, conducted a hearing to determine the child's "best interests" in placing custody. We conclude that a recently enacted statute requires such a hearing, and that the trial court erred in not allowing the putative adoptive parents to offer evidence showing the likelihood of severe psychological harm to the child in the event of a custody transfer to the natural father. We affirm that part of the trial court's order finding the father to be fit, but reverse and remand the custody order for failure to allow the adoptive parents to be heard on the statutorily-mandated best-interests standard.
¶ 3 On November 18, 1997, S. C., the biological father (or Father), of a child not yet born, filed a petition in the District Court of Pittsburg County, Oklahoma, to determine paternity of the child, and requested that he be determined to be the father, and be granted custody of the child. The child, Baby Girl L., was born on February 26, 1998, in Oklahoma City. In the District Court of Oklahoma County, on March 2, 1998, the biological mother gave her consent to the child's adoption by others.
¶ 4 On March 2, 1998, D.M. and B.M., putative adoptive parents,[1] residents of the State of Ohio, filed in the District Court of Oklahoma County an application for an order to terminate the parental rights of the biological father and to determine that the child was eligible for adoption without the consent of the biological father. That day they also filed a petition for adoption in the same court. The District Court of Oklahoma County entered an order in the adoption case awarding temporary custody of the baby girl to the adoptive parents.
¶ 5 An evidentiary hearing was held in the District Court of Oklahoma County, and an order was entered on September 4, 1998, for the adoption of the child without the consent of the father. That order was appealed, and on May 18, 1999, the Oklahoma Court of Civil Appeals reversed the trial court's order. In the Matter of Baby Girl L., No. 92,003.
¶ 6 The appellate court said that the father was not notified of the birth of the child until five days thereafter, and that he did not know the location of mother and child at the time of the birth, although he tried to maintain contact with the mother through her family. The appellate court also stated that he sought to establish his paternity and gain custody before the child was born, that he offered financial support to the biological mother during her pregnancy which she refused, that he mailed to her, on two separate occasions, information and an application relating to medical insurance to take effect when the child was born, that he filed with the Oklahoma Centralized Paternity Registry twelve days after the birth of the child, that he added the child as a beneficiary to his life insurance policy, that he refused to sign a prebirth relinquishment of parental rights when contacted by an employee of an adoption agency, and that upon learning of the child's birth he sent money orders to the mother for the purpose of child support. The appellate court concluded that the child could not be adopted without his consent, and that his parental rights could not be terminated.[2] The adoptive parents sought certiorari *549 from this Court, and their petition was denied.
¶ 7 Two days after this Court denied certiorari the adoptive parents requested a hearing on the adoption in the District Court of Oklahoma County, and they requested that the best interests of the child be determined. The District Court held a status conference and entered an order transferring the adoption case to the District Court of Pittsburg County. The Oklahoma County court determined that the child was born in Oklahoma County, the adoptive parents had never been residents of Oklahoma, the biological mother was a resident of Bryan County, and the biological Father was a resident of Pittsburg County where he filed his application for determination of paternity and child custody. The court determined that judicial economy required the transfer of the cause to Pittsburg County where it could be consolidated with the biological father's proceeding. The parties agreed that the order in the adoption case granting temporary custody would remain in effect until a new custody order was entered by the Pittsburg County court.
¶ 8 Then on October 14, 1999, the adoptive parents filed a proceeding in this Court requesting that we assume original jurisdiction and prevent the transfer of the proceedings to Pittsburg County. Prospective Adoptive Parents of Baby Girl L. v. Hubbard, No. 93,740. The adoptive parents then commenced adoption proceedings in the State of Ohio, and alleged that consent of the father was not necessary. While that proceeding was pending the father filed a petition for writ of habeas corpus in the District Court of Pittsburg County, and requested immediate custody of the child. The trial court declined to issue the writ at that time due to the proceeding then pending in the Supreme Court. On December 1, 1999 this Court declined to assume original jurisdiction on the adoptive parents' request for prohibition. A trial was scheduled in the District Court of Pittsburg County to determine the custody of the child.
¶ 9 Prior to trial the District Court determined that in order for the adoptive parents to retain custody of the child they would need to show that the father was affirmatively unfit as a parent. After some additional proceedings in this Court (Okla.Sup.Ct. Causes No. 94,898 and 94,943) the details of which we need not relate as they do not bear upon the issues pending before us, the District Court of Pittsburg County held a hearing on the consolidated proceedings. The trial court took judicial notice of the previous proceedings in Oklahoma County, including a partial transcript of those proceedings where all parties stipulated that S.C. is the biological father of the child. The biological mother argued that the child should stay with the adoptive parents, or in the alternative, be awarded to her. The trial court concluded that the adoptive parents failed to prove that the father was an unfit parent.
¶ 10 The trial court made a finding that the father "is a fit and proper person to have care and custody and control of" the child. The court ordered temporary custody of the child to be placed jointly with the biological mother and biological father, with a later determination to be made if one or the other should be granted sole custody. The court further ordered that the change in custody would not be immediately enforced, and that the transition in child custody would be pursuant to a plan of the court. The court set a hearing on the plan, to include expert testimony on that subject. The trial court ordered that the biological mother and biological father would be granted unsupervised visitation with the child.
¶ 11 The adoptive parents appealed, and this Court granted a motion to retain the appeal. They assert that they have a constitutional right to custody of the child. Adoptive parents also assert that custody of the child after a failed adoption may be awarded to them according to a statutorily-mandated "best interests" standard, even though the father is not adjudicated as an unfit parent. They also challenge the trial court's ruling on the father's fitness, its failure to change the *550 venue, and the appointment of and representation of, counsel for the child. These latter claims must be addressed since they are independent of whether a best-interests hearing must be held. Father also asserts a constitutional right to custody, and that this right may be lost only upon a showing that he is unfit.[3].

I. The Adoptive Parents' Constitution Based Claim
¶ 12 The adoptive parents argue that both a child and the child's adoptive parents possess constitutionally protected interests in maintaining the parent-child adoptive family relationship after a failed adoption. They rely upon Smith v. Organization of Foster Families For Equality & Reform (O.F.F.E.R.), 431 U.S. 816, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977), and opinions from courts in states other than Oklahoma.
¶ 13 The U.S. Supreme Court has stated that: "This Court's decisions have by now made plain beyond the need for multiple citation that a parent's desire for and right to `the companionship, care, custody and management of his or her children' is an important interest that `undeniably warrants deference and, absent a powerful countervailing interest, protection.'" Lassiter v. Department of Social Services of Durham County, N.C., 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981), quoting, Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972). We are thus faced with the question whether the child and/or adoptive parents possess "countervailing" constitutional interests to be balanced against the biological father's interests.
¶ 14 A party in Smith argued that a foster family relationship created a constitutionally protected interest: "But is the relation of foster parent to foster child sufficiently akin to the concept of `family' recognized in our precedents to merit similar protection?" Smith, 431 U.S. at 842, 97 S.Ct. 2094. After discussing the importance the Court has given to biological and marriage relationships, the Court stated:
No one would seriously dispute that a deeply loving and interdependent relationship between an adult and a child in his or her care may exist even in the absence of blood relationship. At least where a child has been placed in foster care as an infant, has never known his natural parents, and has remained continuously for several years in the care of the same foster parents, it is natural that the foster family should hold the same place in the emotional life of the foster child, and fulfill the same socializing functions, as a natural family. For this reason, we cannot dismiss the foster family as a mere collection of unrelated individuals.
Smith, 431 U.S. at 844, 97 S.Ct. 2094.
The Court then said that:

*551 But there are also important distinctions between the foster family and the natural family. First, unlike the earlier cases recognizing a right to family privacy, the State here seeks to interfere, not with a relationship having its origins entirely apart from the power of the State, but rather with a foster family which has its source in state law and contractual arrangements. . . . While the Court has recognized that liberty interests may in some cases arise from positive-law sources, see, e. g., Wolff v. McDonnell, 418 U.S. 539, 557, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974), in such a case, and particularly where, as here, the claimed interest derives from a knowingly assumed contractual relation with the State, it is appropriate to ascertain from state law the expectations and entitlements of the parties. In this case, the limited recognition accorded to the foster family by the New York statutes and the contracts executed by the foster parents argue against any but the most limited constitutional "liberty" in the foster family.
Smith, 431 U.S. at 845-846, 97 S.Ct. 2094, notes and material omitted.
Like the Court in Smith, we do not dismiss a family, including one containing a child in state-created custodial relationship, as "a mere collection of unrelated individuals". But, as also recognized by dicta in Smith, a temporary child-custody relationship does not necessarily create an interest protected by the Due Process Clause to the same degree as other familial relationships.
¶ 15 In Smith the Court examined the reasonable expectations of the parties involved in the relationship. The Court explained that because the relationship was created by the State for the purpose of temporary custody, the parties could not reasonably expect the development of a permanent and uninterrupted parent-child relationship. The expectations of parties are measured against an objective reasonableness standard in Due Process jurisprudence. Eastern Enterprises v. Apfel, 524 U.S. 498, 527-528, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998) Reasonableness of the expectation is based, in part, upon our history, legal traditions and practices. Washington v. Glucksberg, 521 U.S. 702, 710, 720-721, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997). Similarly, in Michael H. v. Gerald D., supra, this type of "historical traditions" analysis was used by the High Court in explaining why a biological father did not possess a parental right to his biological child born into an intact marriage involving two other adults. Id. 491 U.S. 110, n. 6, 126, 109 S.Ct. 2333, 105 L.Ed.2d 91. We recognize that a child possesses constitutional rights. Planned Parenthood of Central Missouri v. Danforth, 428 U.S. 52, 74, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976). However, the adoptive parents in our case today have cited no authority from this jurisdiction showing that either they or the child possess an expectation interest in permanent custody that is rooted in our history, legal traditions and practices.
¶ 16 On March 2, 1998, the adoptive parents filed an application to terminate the father's parental right. On this date they executed a statement filed in the adoption saying they:
. . . do hereby state that they understand that as of the date of the signing of this document that the rights of the alleged father in this cause have not been terminated nor has he appeared before any court of competent jurisdiction to execute his consent to adoption.
The undersigned state that they are fully aware of the legal risk involved in accepting custody of said child and in transporting the child from the sending state to the receiving state.
The undersigned further state that they have been advised by their attorney as to the risk factor involved pertaining to the above stated facts.
The undersigned further state that being fully aware of the risks involved, that they are willing to accept and assume any risks regarding the termination of the rights of the putative father and further agree to make any court appearances in either sending or receiving state as may be required by the appropriate court of either state.
*552 On March 18, 1998, father filed a response in the adoptive parent's Oklahoma County proceeding, and alleged that the Pittsburg paternity proceeding was pending, that the biological mother had filed an Answer in that proceeding, that he had offered support to the mother, and that he wanted custody of his child. Further, approximately one year and three months after they started the adoption proceeding the Court of Civil Appeals issued an opinion stating that the father's rights were improperly terminated.
¶ 17 The adoptive parents' right to permanent custody of the child has been legally challenged by the father at every stage of the proceedings. The adoptive parents' custody of the child may be characterized as either temporary, or non-final, or pending the litigation. The record shows that the adoptive parents could not have reasonably expected that a temporary parent-child-relationship created during litigation over that relationship would, when combined with a mere lapse of time, create a constitutional right to permanent custody. We conclude that the child and adoptive parents do not possess a Due Process right to a continued adoptive family relationship after a failed adoption merely because of the judicial creation of that temporary relationship. We thus need not engage in a balancing of constitutionally protected interests on this claim by the adoptive parents.

II. The Adoptive Parents' Statute-Based Claim
¶ 18 Adoptive parents argue in the alternative that if they do not possess a constitutional right to a continued family relationship, then they possess a statutory right to show the trial court that awarding custody of the child to her father is not in the child's best interests. They argue that when an adoption fails the trial court must examine the best interests of the child and award custody based upon this standard. They rely upon two statutes in the Oklahoma Adoption Code. The first states:
E. 1. If the court at the hearing determines that the putative father is the biological father of the minor, that the adoption requires the consent of the putative father, that the putative father will not consent, and the court does not terminate the parental rights of the putative father, then the court shall schedule a separate hearing to issue an appropriate order for the legal and physical custody of the minor according to the best interests of the minor, if the court has jurisdiction to issue a custody order. Provided, no such hearing shall be scheduled if a preexisting custody order remains in effect.
. . .
4. At the hearing, the court may award custody to the biological mother, the biological father, the biological parents, if they are married, the prospective adoptive parent, or the Department of Human Services or other licensed childplacing agency, if the Department or agency had legal custody when the petition was filed, according to Section 21.1 of this title, in the best interests of the child.
10 O.S.Supp.1998 § 7505-2.1(E)(1) & (4), emphasis added.
The second statute they rely upon states as follows:
A. If the court denies a petition for adoption or vacates a decree of adoption, it shall dismiss the proceeding. If no preexisting custody order remains in effect, the court shall issue an appropriate order for the legal and physical custody of the minor according to the best interests of the minor, if the court has jurisdiction to issue a custody order.
. . .
3. At the hearing, the court may award custody to the biological mother, the biological father, the biological parents, if they are married, the prospective adoptive parents, or the Department or other licensed child-placing agency if the Department or agency had legal custody of the child at the time that the petition was filed, pursuant to Section 21.1 of this title, in the best interests of the child.
10 O.S.Supp.1998 § 7505-6.4(A) & (B)(3), emphasis added.
Both statutes relied upon by the adoptive parents state that custody is awarded according to § 21.1 of Title 10, and in the best *553 interests of the child.[4] 10 O.S.Supp.1998 § 7505-2.1 (E)(4), 10 O.S.Supp.1998 § 7505-6.4(A) & (B)(3). They argue that this language clearly means that custody of a child may be awarded to individuals other than parents, although the parents have never been judicially determined to be unfit.[5]
¶ 19 Adoptive parents argue that the paramount concern is the best interests of the child, and the best interests of a child are that it not be removed to a different home after three and a half years with one set of parents. They argue that the preference order for custody in § 21.1 is not absolute, and that parental unfitness need not be proven for them to have permanent custody of the child. They cite four opinions from this jurisdiction in support of their argument. None are controlling. Three are non-precedential opinions which do not involve custodial disputes between a natural parent and a non-parent where the non-parent was awarded permanent custody.[6] The fourth opinion, Carter v. Carter, 1982 OK 123, 653 P.2d 207, involves a custody dispute between the biological mother and biological father, predates the recent Adoption Code, and does not materially assist our resolution.
¶ 20 The Oklahoma Adoption Code, 10 O.S.Supp.1997 § 7501-1.1 thru § 7511-1.5 (as amended), is not an adoption of the Revised Uniform Adoption Act (1994). See Oklahoma Comments to 10 O.S.A. § 7501-1.1 (West 1998). However, some sections and concepts from the Uniform Act were incorporated into the Oklahoma Adoption Code. Id. Section 7505-6.4, as originally codified in 1997, contained the following Comment.
If the court denies a petition for adoption, the court must decide who is to be awarded legal and physical custody of the minor. Section 7505-6.4 requires that a separate custody hearing be scheduled to determine the minor's custody and establishes that the standard for awarding custody at that hearing shall be the best interests of the child. This is a new provision in Oklahoma law. A similar provision is contained in Section 3-704 of the 1994 Uniform Adoption Act (1994 UAA). A parallel section is contained in Subsection D of Section 7505-2.1, which requires that the court schedule a separate custody hearing after a hearing on a preadoption petition to terminate the parental rights of a putative father, if the putative father refuses to consent or relinquish and the court finds the adoption cannot proceed without his consent and fails to terminate his parental rights.
10 O.S.A. § 7506-6.4 (West 1998), Oklahoma Comments.
*554 Then in 1998 this section was amended. The Oklahoma Comment to § 7505-6.4, the section providing legal guidance if the court denies a petition for adoption, states in part::
At the custody hearing, the court may award custody of the minor to the biological mother, the biological father, or to both biological parents if they are married to each other. The court may also choose to award custody to the prospective adoptive parent, or to the Department of Human Service(s) or a licensed child-placing agency, if the Department or agency had legal custody of the minor at the time the petition for termination was filed. As provided in new Paragraph 3 of subsection B, the custody award is to be made in the best interests of the child, according to the standards of Section 21.1 of Title 10.
10 O.S.A. § 7505-6.4 (West 2002 Supp.), Oklahoma Comments.
Adoptive parents argue that the statutorily-required "best interests" hearing is legislative recognition that placement of a child after a failed adoption with the adoptive parents is for the purpose of avoiding harm to the child. One author explained:
Public support for creation of a best interests hearing following a failed adoption swelled after the media attention given to the "Baby Jessica" case. The dissenting justice in the Michigan Supreme Court's opinion in that case, argued forcefully that the Michigan courts should resolve the custody issue through a best interests hearing. . . . Nevertheless, in adoptions filed originally in Oklahoma with proper jurisdiction, the availability of a best interests hearing would potentially give prospective adoptive parents, particularly those with whom a child had resided for a lengthy period, as well as either biological parent, the opportunity to seek custody.
A similar provision in the 1994 UAA received strong praise from some, who view it as an opportunity to save a child from the loss of "established ties" with the child's prospective adoptive parents. As one author forcefully argued, "[e]ven if the court finds that no grounds exist for terminating a birth parent's rights, a child is not a trophy to be handed over to the prevailing birth parent without further thought." A countervailing concern, however, is that the availability of the best interests hearing may motivate some adoptive parents to litigate to the "bitter end" in the hope that even if they lose, ultimately a court will grant them custody because the child has bonded to them in the intervening years. . . . If the availability of the best interests hearing has this unintended effect, it will be most unfortunate.
Blair, The New Oklahoma Adoption Code: A Quest to Accommodate Diverse Interests, 33 Tulsa L.J. 177, 239-240 (1997), (notes omitted), quoting, Lowe, Parents and Strangers: The Uniform Adoption Act Revisits the Parental Rights Doctrine, 30 Fam. L.Q. 379, 419 (1996). See also Meyer, Family Ties: Solving the Constitutional Dilemma of the Faultless Father, 41 Ariz. L.Rev. 753, 770 (1999), (discussing the legislative responses to the Baby Jessica and Baby Richard cases).
¶ 21 Section 7505-6.4 states that in the event of a failed adoption custody is to be awarded according to the best interests of the child to a statutory class of individuals, and this class includes both prospective adoptive parents and biological parents. Of course, it also states that the award will be according to "the standards" of § 21.1, and § 21.1 applies its own best-interests standard with a class of individuals that is not identical to that in § 7505-6.4. A statute must be read to render every part operative and to avoid rendering it superfluous or useless. Comer v. Preferred Risk Mut. Ins. Co., 1999 OK 86, n. 35, 991 P.2d 1006, 1014. Given the legislative history of the Adoption Code, and § 7505-6.4 in particular, along with the express language of that section, we construe § 7505-6.4 as requiring a trial court to determine the best interests of the child in awarding custody after a failed adoption. Further, when a special statute clearly includes the matter in controversy the special statute controls over a statute of general applicability. Davis v. GHS Health Maintenance Organization, Inc., 2001 OK 3, ¶ 10, 22 P.3d 1204, 1209. Section 7505-6.4 of the Oklahoma Adoption Code is clearly applicable in our case, and it is equally clear that the hearing *555 provided for in that section has not yet taken place.

III. Best Interests, the Parens Patriae Doctrine, and a Parent's Constitutional Rights
¶ 22 Father challenges any statutory construction that allows a "best-interests" hearing as not only contrary to § 21.1, but as a denial of his constitutional right to custody of his biological child. Parents possess a right to the custody of their children and there is a presumption that a fit parent will act in his or her child's best interests and protect the child. Parham v. J. R., 442 U.S. 584, 602-603, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979).[7] Thus, our opinions have often discussed parental unfitness when we have applied the "best interests" standard for determining permanent child custody in disputes between a parent and a third party. For example, in Matter of Guardianship of M.R.S., 1998 OK 38, ¶ 21, 960 P.2d 357, 363, we said that:
Our cases make clear that the parent is entitled to custody unless found unfit. The best interests of the child are presumed to be with the parents in the absence of clear and convincing evidence to the contrary. Natural parents will not be deprived of custody simply because another family might be able to provide more amenities and opportunities for the child.
Id. 1998 OK 38, at ¶ 21, 960 P.2d at 363.
¶ 23 The State of Oklahoma, however, also possesses a right, in the role as parens patriae, to protect its infant citizens from harm. Gowin v. Julius, 1954 OK 359, 279 P.2d 954, 956. Accord, Santosky v. Kramer, 455 U.S. 745, 766, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), (the State has a parens patriae interest in preserving and promoting the welfare of children).[8]
Although parents enjoy a constitutionally protected interest in their family integrity, this interest is counterbalanced by the "`compelling governmental interest in the protection of minor children, particularly in circumstances where the protection is considered necessary as against the parents themselves.'" Manzano v. South Dakota Dep't of Social Servs., 60 F.3d 505, 510 (8th Cir.1995) (quoting Myers v. Morris, 810 F.2d 1437, 1462 (8th Cir.1987), overruled on other grounds by Burns v. Reed, 500 U.S. 478, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991)).
Wilkinson ex rel. Wilkinson v. Russell, 182 F.3d 89, 104 (2d Cir.1999), cert. den., 528 U.S. 1155, 120 S.Ct. 1160, 145 L.Ed.2d 1072 (2000), emphasis added.
If parental rights are to be terminated "Substantive due process forbids termination of such fundamental rights in the absence of a demonstration of a compelling state interest in the form of specific findings of existing or threatened harm to the child." Matter of J.N.M., 1982 OK 153, 655 P.2d 1032, 1036. When parental fitness is defined as a condition excluding any harm occasioned by assignment of a child's custody to its parent, the High Court has stated that "`[T]he State registers no gain towards its declared goals when it separates children from the custody of fit parents.'" Santosky v. Kramer, 455 U.S. at 767, 102 S.Ct. 1388, quoting, Stanley v. Illinois, 405 U.S. 645, 652, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). But the State has a legitimate interest in protecting a child's "moral, emotional, mental, and physical welfare", Stanley v. Illinois, 405 U.S. at 652-653, 92 S.Ct. 1208, and the State has the power to implement this interest, as it has done here, by statutorily providing for a best-interests test in the *556 event of a failed adoption. The adoptive parents now justify their quest for custody as a legitimate exercise of State power to avoid a State-perceived harm (i.e., psychological harm) to its infant citizens suffered by those infants that have bonded to adoptive parents during failed adoptions and then awarded to natural parents whom have never had custody of the children.
¶ 24 Prior to the 1994 Uniform Adoption Act some courts recognized that the serious psychological harm resulting from an award of custody to a parent after a failed adoption would not be in the best interests of the child. See, e.g., Sorentino v. Family and Children's Soc. of Elizabeth, 74 N.J. 313, 378 A.2d 18 (1977); Lemley v. Barr, 176 W.Va. 378, 343 S.E.2d 101 (1986). The Oklahoma Legislature has determined that after a failed adoption the child should not automatically be returned to the child's biological parents because a serious psychological harm to a child may occur in a particular case. The State may protect infants from serious psychological harm.
¶ 25 The temporary custody of the child by the adoptive parents in this case is rapidly approaching the four-year mark. The adoptive father is employed away from the home during the day and the adoptive mother has cared for the child in the home. The only parents the child knows are her adoptive parents. The adoptive parents called a psychologist to testify on the psychological trauma that the child would experience with a change in custody. His testimony was not allowed and his report, previously filed in the case, was not allowed as an exhibit during the trial. The trial court reasoned that psychological trauma experienced by the child was not relevant on the issue of the father's fitness. The biological father has never been introduced to the child as her biological father because of the possibility that he would not prevail in his quest for custody.
¶ 26 Our Legislature has used imminent or actual harm to a child as a basis for terminating or restricting parental rights. See, e.g., Matter of J.N.M., supra. See also, 10 O.S.Supp.2000 § 7003-4.6(A)(9), (preservation of a family is not required if a court determines that an abandonment has occurred that constitutes a serious danger to the health and safety of the child). As our opinion herein indicates, an unwed biological father who has not been determined to be unfit, and who has publicly, and unreservedly, and timely assumed his parental obligations, and is judicially seeking custody of his child possesses a right to temporary custody that is superior to that of parties unrelated to his child, and must be afforded a hearing on his claim to temporary custody.
¶ 27 In our case today, the father did seek temporary custody on occasion, but he did not press for a trial court order actually denying or granting that custody. This is why the order of February 2001 here on appeal could correctly state that the temporary custody order issued in Oklahoma County in March of 1998 "has remained in effect until the present time, and has not previously been the subject of a hearing on the merits." (O.R. at 858). Father sought temporary custody in April of 1998, but his motion was stricken and to be reset on motion of any party. In May of 1999 he sought temporary custody, but his motion was stayed pending the outcome of the first appeal. In October 1999 the parties agreed that custody should remain with the adoptive parents until changed by the Pittsburg County judge. A temporary custody order in this failed adoption was allowed, by the parties and the courts, to go unreviewed on the merits for almost four years.
¶ 28 The Legislature has endeavored to avoid serious psychological harm to children resulting from failed adoptions. It has sought this goal by a "best interests" hearing after the failed adoption and by applying certain requirements for temporary custody orders. How the biological parents, adoptive parents, and the courts treat the temporary custody of young children must reflect the Legislature's concern.
¶ 29 When we examine statutes there is a presumption that they are constitutional and we construe them, if at all possible, to be consistent with constitutional provisions. Naylor v. Petuskey, 1992 OK 88, n. 2, 834 P.2d 439, 440; St. Paul Fire & Marine Ins. Co. v. Getty Co., 1989 OK 139, 782 P.2d *557 915, 918. We read 10 O.S. §§ 7505-2.1(E) and 7505-6.4 to require the trial court to hold a "best-interests" hearing. The adoptive parents argue that a showing of serious psychological harm to the child resulting from a change in custody to the biological parent after a lengthy failed adoption is sufficient to defeat a biological's father's right to custody when the father has not had temporary custody and fulfilled the role of a parent. We agree that the adoptive parents should be allowed to make such a showing, and that if made, a trial court may award custody under the statute to a party other than a biological parent. The trial court did not allow a statutorily-required best-interests hearing, or allow the adoptive parents to introduce evidence showing the likelihood of serious harm to the child by a change in the child's custody, and the order of the trial court must thus be reversed.
¶ 30 We caution to note that merely showing on remand that the child has a strong relationship with the adoptive parents or might be better off if left in their custody based on some type of comparative fitness test or balancing is not enough to show serious psychological harm. See In the Matter of the Guardianship of J.C., 129 N.J. 1, 608 A.2d 1312, 1320 (1992). Our ruling here should not be interpreted as giving judicial imprimatur to some form of subtle social engineering in custody cases involving third parties and we are not sanctioning the reallocation of children merely because putative adoptive parents might be "better" parents than a biological father. Ultimately, the standard adopted today, based on constitutional considerations and on legislative authorization, has as its benchmark the welfare of the child while at the same time protecting the rights of biological parents. See Watkins v. Nelson, 163 N.J. 235, 748 A.2d 558, 567-568 (2000). Simply, the standard to be applied on remand is not one of comparative fitness nor is it one that may be used to victimize poor (or otherwise arguably disadvantaged) biological parents on the basis of some well-meaning, but misguided, view that certain adoptive custodians might possibly be "better" parents than the child's biological parents. Id.
¶ 31 Furthermore, although the phrase serious psychological harm may not lend itself to precise definition, a general definition is that it is both serious and enduring psychological harm [In the Matter of the Guardianship of J.C., supra, 608 A.2d at 1320], grave psychological trauma that would drastically affect the welfare of the child. Bennett v. Jeffreys, 40 N.Y.2d 543, 387 N.Y.S.2d 821, 356 N.E.2d 277, 283-284 (1976). In other words, it is severe and long-term emotional or psychological trauma, not merely separation anxiety of either minimal impact, or that would likely last for only a relatively short-term period. The standard we adopt is not that a change in custody cause no psychological pain or trauma, but serious, extensive and lasting harm.
¶ 32 Nor is the harm envisioned that which can be remediated or repaired either easily or through diligent effort on the part of a willing biological parent so that an essentially emotionally and psychologically healthy child will likely emerge after a transfer of custody. Thus, the capability of the biological parent to overcome any claim of such harm is a relevant factor in the inquiry. See In the Matter of the Guardianship of K.L.F., 129 N.J. 32, 608 A.2d 1327, 1332 (1992). Also, the conduct of the parties during the custody dispute is also relevant, and expert psychological and other background examinations of all parties is necessary to properly evaluate any claim that such harm would be caused and, of course, to make a rational determination as to whether the child can be transitioned into the biological parent's home without the likelihood of such harm.
¶ 33 Without a showing of serious psychological harm, as above defined, the New York Court of Appeals has aptly stated our view of the rights biological parents have to the care, custody and rearing of their biological offspring:
In all of this troublesome and troubled area there is a fundamental principle. Neither law, nor policy, nor the tenets of our society would allow a child to be separated by officials of the State from its parent unless circumstances are compelling. *558 Neither the lawyers nor Judges in the judicial system nor the experts in psychology or social welfare may displace the primary responsibility of child-raising that naturally and legally falls to those who conceive and bear children.
Bennett v. Jeffreys, supra, 356 N.E.2d at 285. Although a grant of custody to adoptive parents in this case would not, of course, amount to a termination of father's parental rights, it would certainly be a weighty restriction on his parental rights, i.e. depriving him for a potentially indeterminate time of the care and custody of his biological offspring. In our view, substantive due process prohibits (as it also does in the termination context) this type of a restriction on such a fundamental right without a demonstration of a compelling state interest in the form of specific findings of existing or threatened harm to the child. Furthermore, in view of the constitutionally-based anchor of the fit biological parent's right and also based on the legislative scheme before us, a fit biological parent is plainly entitled to a preference or presumption that custody of the child should be with said parent in any dispute with third parties, like the adoptive parents here. Other courts have recognized, as we do today however, that the presumption in favor of the biological parent may be overcome not only by sufficient proof of gross misconduct, abandonment and unfitness, but by a sufficient showing of the extraordinary or exceptional (i.e. highly unusual) circumstance that serious psychological harm to the child would likely result from an award of custody to the biological parent. See e.g. Watkins v. Nelson, supra; see also Matter of Adoption of J.J.B., 119 N.M. 638, 894 P.2d 994 (1995), cert. denied 516 U.S. 860, 116 S.Ct. 168, 133 L.Ed.2d 110 (1995).
¶ 34 We also make clear that the burden of proof on remand is on the adoptive parents to show by clear and convincing evidence that serious psychological harm will be caused to the child to a reasonable psychological certainty from a change in custody from them to the father. See In the Matter of the Guardianship of K.L.F., supra, 608 A.2d at 1333. Finally, even if adoptive parents meet their burden and the trial judge decides custody should remain with them, such determination would not amount to a permanent custody decision. Any such decision would be open to reconsideration at an appropriate time, that time being essentially when the child might be transferred to father's custody without serious psychological harm or when there is evidence of some other changed condition which would require a change of custody. Should a decision be made to award custody to the biological father a reasonable transition plan may be appropriate and the trial judge would have the authority to implement a change of custody from adoptive parents to the biological father and/or mother by the use of such a plan.

IV. The Issue of the Father's Fitness
¶ 35 Adoptive parents assert that the father lives "a morally corrupt life" because of his sexual relationships with six women over a five-year period that resulted in two births. They argue that sexual relations out of wedlock are immoral and he is thus unfit. They further assert that Father has not provided voluntary financial assistance for his other child. They point to the fact that Father has attended 18 hours of visitation out of a possible 36 allowed by the trial court in this case. They argue that Father's income is insufficient to provide for a child, and that Father will necessarily be required to continue to live with his parents to take advantage of their income and assistance with raising the child.
¶ 36 Adoptive parents assert that Father's employer terminated his employment because of poor performance. They cite to Father's pauper's affidavit filed in his prior appeal in this Court, and argue that such use was improper because "he certainly could have paid some of these expenses." They assert that the father paid a fine for having an illegal open container in a motor vehicle, that his driver's license had been suspended and reinstated, and that he operated a car while his license was suspended. They also assert he is unfit because of the harm to the child that will result with a change in custody.
*559 ¶ 37 The father asserts that he had a problem with a supervisor at one employer. The supervisor was called as a witness and testified that father was a "good worker" but he was tardy to work and left work early too many times. Father testified that he has had other employment, and is currently maintaining "full-time employment" while continuing school. At the trial court hearing in February 2001, he testified that he was in a continuous monogamous relationship for the last seventeen months. He argued that a pauper's affidavit was used at the time he was in college, had minimal means, the cost of the transcript in that appeal was $1,200.00, and use of the affidavit was not challenged. Father testified the he worked 40 hours a week and would complete his present course of study in May of 2001. He testified that he had given some clothes and toys to the child.[9]
¶ 38 Father testified that he received tickets for an open container in a motor vehicle, speeding at 81 m.p.h. in a 70 m.p.h. zone, and a further speeding violation. He testified that his license had been suspended twice for non-payment of tickets and then reinstated. He stated that the open container was a beer can belonging to another person in the car. He testified that he had a current driver's license but no automobile. He testified that some of his visits with the child in Ohio he cut short because of a need to return to Oklahoma. He also testified that a scheduled visit in a church in Edmond did not last long because he first went to a church in Norman. He has traveled to Ohio three times by airplane and twice by car to visit his daughter.
¶ 39 The biological father currently lives with his mother and father. He also has a son that also resides in that home on certain weekends and specified nights, according to a court-ordered visitation schedule. He attends college two days a week from 9:45 a.m. to 2:00 p.m., and he works 40 hours a week on a night shift. He testified that the child would live with him and the child's grandparents, and that the child would receive care from the child's grandmother when he is not home. He said that he expected his child to be "slightly disturbed" with a change in custody, and that he had contacted a counselor at Southeastern Counseling Services in McAlester for counseling if the change in custody occurred. He stated that he had not explained to the child that he is her father because of the possibility that he would not obtain legal custody. He stated that a room in his home had been set aside for his daughter.
¶ 40 One witness was a social worker who performs home studies for private parties and under contract with the Department of Human Services. The trial court ordered a home study and she performed one at the request of Father's lawyers. She testified that she works at a "licensed child placing agency" and has five years of experience with home studies. She visited the father's home three times and observed Father with his son on two occasions, as well as doing the standard background checks. The final visit or session was in her office. Her conclusion was that Father was a fit parent and his home a fit place for placement of a child.
¶ 41 We have said that: "this Court repeatedly has held that for custody to be taken from the parent there must be a showing, by clear and convincing evidence, of unfitness of the parent, and `unfitness' means that the parent is unable to provide for the child's ordinary comfort or intellectual and moral development, and the fact that the child might be better cared for by a third person does not deprive the parent of the right to custody." Guardianship of M.R.S., 1998 OK 38, ¶ 16, 960 P.2d 357, 362. The evidence presented does not show that the biological father is unable to provide for the child's ordinary comfort or intellectual and moral development. We affirm the trial court's order finding the father to be a fit parent.

V. Venue
¶ 42 The venue of an action to determine paternity is at the option of the plaintiff and *560 is in the county where the putative father, mother, or child reside.[10] An adoption may be brought in the district court in the county where the petitioners or the child reside.[11] A preadoption petition for the termination of a putative father's parental rights may be filed in the district court in the county where the mother has executed a relinquishment of her rights, or in the county where the putative father, or the petitioner, or the child resides at the time the petition is filed.[12]
¶ 43 First, the father argues that adoptive parents waived their objection to venue in Pittsburg County. The District Court of Oklahoma County held a status conference with the parties and thereafter entered an order transferring the case to Pittsburg County. The order transferring the matter states the "agreement of the parties" that the "custody of the child shall not be changed until Order of the Court" by the judge of the District Court of Pittsburg County.
¶ 44 After an adoption petition is denied or vacated the District Court dismisses the proceeding and issues the appropriate custody order.
A. If the court denies a petition for adoption or vacates a decree of adoption, it shall dismiss the proceeding. If no preexisting custody order remains in effect, the court shall issue an appropriate order for the legal and physical custody of the minor according to the best interests of the minor, if the court has jurisdiction to issue a custody order.
10 O.S.Supp.1998 § 7505-6.4(A).
After the conclusion of the appellate proceedings determining that the child could not be adopted without the consent of the father, the District Court of Oklahoma County adoption proceeding was required to issue "an appropriate custody" order and dismiss the proceeding as to the claim for adoption. The affirmative relief to be performed was a custody order that the parties agreed could be entered by the District Court of Pittsburg County. An objection to venue must be timely or it is waived. Halliburton Co. v. District Court of Creek County, 1974 OK 90, 525 P.2d 628. A party waives a venue objection if that party has sought affirmative relief from the court. State ex rel. Cartwright v. Ogden, 1982 OK 82, 657 P.2d 142, 145. The parties' agreement that custody would be determined by the District Court of Pittsburg County waived their objection to venue.

VI. The Court-Appointed Counsel Claim
¶ 45 In a contested adoption proceeding a lawyer is appointed for the child. "In a proceeding pursuant to the Oklahoma Adoption Code, the court shall appoint an attorney for a minor in a contested proceeding pursuant to the Oklahoma Adoption Code and may appoint an attorney for a child in an uncontested proceeding." 10 O.S.Supp.1998 § 7505-1.2. The adoptive parents maintain that trial counsel for the child provided ineffective assistance. While they admit that the child's counsel appeared at hearings, cross-examined witnesses, and made argument, they find fault in that the child's lawyer did not adopt the same arguments and view of the case as counsel for the adoptive parents. While they allege that the child was "prejudiced" no specific conduct is linked to a legal detriment or prejudice actually suffered by the child. When appointed counsel is required by constitution and statute then counsel *561 must render "effective assistance" of counsel. Matter of D.D.F., 1990 OK 89, 801 P.2d 703, 707. Much of the adoptive parents' complaint is that counsel did not advocate a "best interests" standard before the trial court, although the trial court had previously ruled that the standard would not apply. Since we reverse the trial court today and require that a "best-interests" hearing be held, we need not further address the ineffective assistance of counsel claim.

VII. The Motion for Appointment of a Guardian Ad Litem
¶ 46 After the record on appeal and all of the appellate briefs were filed in this Court the adoptive parents filed a motion for leave to proceed in the trial court for appointment of a new guardian ad litem for the child during the appeal. The District Court previously appointed a lawyer to represent the child, and no party objected to that appointment. On appeal they challenged that lawyer's representation and alleged that it was deficient. Father responded and argued that the request was for the purpose of delaying the appellate disposition. We agree that we need not require the trial court to appoint additional counsel.
¶ 47 This Court has long-recognized the authority of District Court to appoint a guardian ad litem during an appeal. Tisdale v. Wheeler Bros. Grain Co., Inc., 1979 OK 94, 599 P.2d 1104, 1106. Our rules state that after a petition in error is filed in the Supreme Court the trial court retains jurisdiction to "grant or modify orders in regard to custody, guardianship, support, and maintenance" and "change the status of a litigant from that of next friend to guardian ad litem, or to appoint an attorney for such litigant" and "take action with respect to any issue collateral to a pending appeal". 12 O.S.Supp. 2000 Ch. 15, App., Okla. Sup.Ct. R. 1.37, (emphasis added).
¶ 48 Because trial court counsel for the child is familiar with the trial court proceedings, and the appeal is a continuation of that proceeding, and because of the short duration of time to prosecute and defend appellate proceedings, the appointment of trial counsel for a child will ordinarily include authority, either express or implied, to represent the child on appeal. Counsel appointed to represent a child in the trial court should continue that representation on appeal, unless allowed to withdraw by the trial or appellate court and substitute counsel appointed. As we previously explained, after a failed adoption a best-interests hearing must be held and this has not yet occurred. The motion of the adoptive parents for a delay of the appellate proceedings for the purpose of appearing in the trial court for the appointment of counsel for the child is denied.

VIII. The Motion to Lift the Trial Court's Stay of Proceedings
¶ 49 The trial court stayed further proceedings on the issue of the father's visitation with the child. A few days later on October 22, 2001, the biological father filed in this appeal a motion to lift that stay. The adoptive parents responded. We construe the motion and response as seeking appellate review of the trial court's order pursuant to Okla.Sup.Ct.R. 1.37(b).[13]
¶ 50 Visitation orders are reviewed on appeal by determining if the trial court abused its discretion. Abbott v. Abbott, 2001 OK 31, 25 P.3d 291, 294 (abuse of discretion shown); K.R. v. B.M.H., 1999 OK 40, ¶ 24, 982 P.2d 521, 525 (abuse of discretion not shown). A decision to be reviewed on appeal is presumed correct unless the contrary is shown by the record. Enochs v. Martin Properties, Inc., 1997 OK 132, ¶ 5, 954 P.2d 124, 127; Hamid v. Sew Original, *562 1982 OK 46, 645 P.2d 496, 497. The parties did not seek to amend the appellate record to include matters considered by the trial court in issuing the stay. The appellate record before us does not include the stay proceedings and we must thus affirm the trial court.

IX. Summary
¶ 51 In summary, that part of the trial court's order holding the biological father to be a fit parent is affirmed, as is the trial court's order staying the proceedings pending appeal. The trial court's order is reversed on all other matters, and specifically, the award of custody to the biological father and mother is reversed. A biological father does not possess an absolute right to child custody that would cause serious psychological harm to the child, and adoptive parents in this case must be given the statutory opportunity to present evidence on best interests of the child. The matter is remanded to the District Court for the purpose of a statutorily-required hearing to determine the best interests of the child in awarding child custody consistent with the views expressed in this opinion.
¶ 52 WATT, V.C.J., and HODGES, LAVENDER, OPALA, KAUGER, WINCHESTER, JJ., Concur.
¶ 53 HARGRAVE, C.J., Dissents.
¶ 54 BOUDREAU, J., Disqualified.
NOTES
[1] For ease of reference we refer in this opinion to D.M. and B.M. as the "adoptive parents" although the adoption failed.
[2] These conclusions by the Court of Civil Appeals are not before us for corrective review because the settled-law-of-the-case doctrine precludes review of issues decided by an appellate opinion that has become final in a previous appeal in the same cause. Cinco Enterprises, Inc. v. Benso, 1999 OK 80, ¶ 10, 995 P.2d 1080, 1083; Shoemaker v. Estate of Freeman, 1998 OK 17, ¶ 15, 967 P.2d 871, 875.
[3] Father filed a motion to amend the style of this appeal to conform to Okla.Sup.Ct.R. 1.25. The style of a petition in error is based upon the style of the action in the trial court. Okla.Sup.Ct.R. 1.25(b) citing, 20 O.S.1991 § 3002. Because we use a different style in the published opinion and we decline to delay this proceeding, we need not correct the style on the docket. The style of a published opinion in an appeal from an order in an adoption proceeding uses the child's initials instead of the child's name. Okla.Sup.Ct.R. 1.25(b), citing, 10 O.S.1991 § 1123.1, (now codified as amended, 10 O.S.Supp.1996 § 7003-6.3). This Court also possesses the discretion to identify parties other than children by their initials in child custody or adoption proceedings. See, e.g., S.W. v. Duncan, 2001 OK 39, 24 P.3d 846; Matter of Adoption of R.R.R., 1988 OK 109, 763 P.2d 94. Thus, we have identified all parties in the style and opinion by their initials, and we deny the motion to amend the caption.

Adoptive parents filed an Appendix containing nineteen (19) exhibits and Father moved to strike the Appendix. The Appendix and its filed corrections were stricken by an order of the Chief Justice. Adoptive parents responded to the Order and requested that the Appendix not be stricken. The Appendix was stricken for non-compliance with the Rules of this Court. See Okla.Sup.Ct.R. 1.11(i). Facts are presented by an appellate record certified by the Clerk of the District Court, and facts are not presented to an appellate court by instruments attached as an appendix to an appellate brief. See Chamberlin v. Chamberlin, 1986 OK 30, ¶ 4, 720 P.2d 721, 723; S.W. v. Duncan, 2001 OK 39, n. 14, 24 P.3d 846, 855. Accord, Dowling v. Prado Verde Ranch, Inc., 2001 OK 16, ¶ 8, ___ P.3d ___, (mandate issued Nov. 20, 2001), (court amended Rule 1.11 by allowing citation to record for identifying challenged instruction, and facts cited must still be supported by citation to record). Adoptive parents motion to not strike the already stricken Appendix is denied.
[4] 10 O.S.Supp.1998 § 21.1 provides in pertinent part:

Custody or guardianship  Order of preference  Death of custodial parent  Preference of child  Evidence of domestic abuse  Registered sex offenders
A. Custody should be awarded or a guardian appointed in the following order of preference according to the best interests of the child to:
1. A parent or to both parents jointly except as otherwise provided in subsection B of this section;
2. A grandparent;
3. A person who was indicated by the wishes of a deceased parent;
4. A relative of either parent;
5. The person in whose home the child has been living in a wholesome and stable environment; or
6. Any other person deemed by the court to be suitable and able to provide adequate and proper care and guidance for the child.
[5] The prospective adoptive parents are one of the statutorily-designated parties who may be awarded custody of a child after a failed adoption. This statutorily-created benefit confers upon the adoptive parents here standing to contest Father's claim to custody of the child. See, e.g., Gay v. Akin, 1988 OK 150, n. 28, 766 P.2d 985, (party possessing statutory benefit possessed standing); In re Bomgardner, 1985 OK 59, 711 P.2d 92, 97, (grandparent possessed standing, in part, due to statute providing benefit of grandparent visitation).
[6] See Olinghouse v. Olinghouse, 1995 OK CIV APP 104, 908 P.2d 280, (appellate court affirmed an order granting custody to the biological mother); Application of Smith, 1992 OK CIV APP 97, 837 P.2d 929, 931 (appellate court explained that controversy did not involve a biological parent); Brown v. Brown, 1993 OK CIV APP 142, 867 P.2d 477, (appellate court affirmed an order granting custody to father instead of mother). Opinions released for publication by the Court of Civil Appeals are not precedent, but may be cited for persuasive value. Davis v. CMS Continental Natural Gas, Inc., 2001 OK 33, n. 20, 23 P.3d 288, 296; Chronic Pain Associates, Inc. v. Bubenik, 1994 OK 127, n. 5, 885 P.2d 1358, 1364.
[7] A child's best interest is presumably served by custody possessed by the biological parents if this can be done with a reasonable assurance that no abuse or neglect would result from that custody. In re T.H.L., 1981 OK 103, 636 P.2d 330, 332. The State possess an interest to protect a child from serious physical harm that is sufficient to defeat a claimed parental right to custody if the parent causes the harm. See, e.g., Matter of D.D.F., 1990 OK 89, 801 P.2d 703, (termination of parental rights because of child abuse).
[8] The doctrine of parens patriae "may be defined as the inherent power and authority of a Legislature of a state to provide protection of the person and property of persons non sui juris, such as minors, insane, and incompetent persons." McIntosh v. Dill, 1922 OK 35, 205 P. 917, 925, cert. denied, 260 U.S. 721, 43 S.Ct. 12, 67 L.Ed. 480 (1922).
[9] Generally, a parent's obligation to support his or her child subject to an adoption proceeding "shall not be terminated until such time as a final decree of adoption has been entered." 10 O.S.Supp.2000 § 7505-4.1(L). No party has pointed to any order of a District Court requiring the biological father to support the child.
[10] 10 O.S.Supp.1998 § 89(B):

Venue of an action to determine the paternity of a child pursuant to this section shall be, at the option of the plaintiff, in either the county where the putative father, mother, or child resides. If the mother or child or both the mother and child reside out-of-state, venue of an action to determine the paternity of a child pursuant to this section, at the option of the plaintiff, may be in the county where the putative father resides.
[11] 10 O.S.Supp.1998 § 7502-1.2:

Proceedings for adoption may be brought in the district court in the county where the petitioners or the child to be adopted reside.
Venue
[12] 10 O.S.Supp.1998 § 7505-2.1(A)(1):

Prior to the filing of a petition for adoption, an agency, attorney, or prospective adoptive parent to whom a mother has permanently relinquished a minor born out of wedlock may file a petition for the termination of the parental rights of a putative father of the child. The petition shall be filed with the district court of the county in which the relinquishment was executed or in the county in which the putative father, the petitioner, or the minor resides at the time of the filing of the petition.
[13] Okla.Sup.Ct.R. 1.37(b):

(b) Review of Trial Court Rulings Pending Appeal. Except as provided in Subdivision (a)(3) & (10), review of the trial court's ruling upon any of the matters set forth in part (a) of this Rule shall be by motion filed in the Supreme Court which shall be entertained in the principal appeal. However, a petition in error or amended petition in error shall be filed in the Supreme Court to seek review of the trial court's ruling when statute or the Rules of the Supreme Court require review of the trial court's ruling by a petition or amended petition in error. See, e.g., Rule 1.36(k). When review of a trial court's ruling is sought by motion, it must be filed in the Supreme Court within thirty (30) days of the date the trial court's ruling is filed in the trial court.