Justice ALITO delivered the opinion of the Court.
*641 This case is about a little girl (Baby Girl) who is classified as an Indian because she is 1.2% (3/256) Cherokee. Because Baby Girl is classified in this way, the South Carolina Supreme Court held that certain provisions of the federal Indian Child Welfare Act of 1978 required her to be taken, at the age of 27 months, from the only parents she had ever known and handed over to her biological father, who had attempted to relinquish his parental rights and who had no prior contact with the child. The provisions of the federal statute *2557 at issue here do not demand this result.
Contrary to the State Supreme Court's ruling, we hold that 25 U.S.C. § 1912(f) -which bars involuntary termination of a parent's rights in the absence of a heightened showing that serious harm to the Indian child is likely to result from the parent's "continued custody" of the child-does not apply when, as here, the relevant parent never had custody of the child. We further hold that § 1912(d) -which conditions involuntary termination of parental rights with respect to an Indian child on a showing that remedial efforts have been made to prevent the "breakup of the Indian family"-is inapplicable when, as here, the parent abandoned the Indian child before birth and never had custody of the child.
*642 Finally, we clarify that § 1915(a), which provides placement preferences for the adoption of Indian children, does not bar a non-Indian family like Adoptive Couple from adopting an Indian child when no other eligible candidates have sought to adopt the child. We accordingly reverse the South Carolina Supreme Court's judgment and remand for further proceedings.
I
"The Indian Child Welfare Act of 1978 (ICWA), 92 Stat. 3069, 25 U.S.C. §§ 1901 - 1963, was the product of rising concern in the mid-1970's over the consequences to Indian children, Indian families, and Indian tribes of abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes." Mississippi Band of Choctaw Indians v. Holyfield, 490 U.S. 30, 32, 109 S.Ct. 1597, 104 L.Ed.2d 29 (1989). Congress found that "an alarmingly high percentage of Indian families [were being] broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies." § 1901(4). This "wholesale removal of Indian children from their homes" prompted Congress to enact the ICWA, which establishes federal standards that govern state-court child custody proceedings involving Indian children. Id., at 32, 36, 109 S.Ct. 1597 (internal quotation marks omitted); see also § 1902 (declaring that the ICWA establishes "minimum Federal standards for the removal of Indian children from their families").[1]
*643 Three provisions of the ICWA are especially relevant to this case. First, "[a]ny party seeking" an involuntary termination of parental rights to an Indian child under state law must demonstrate that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." § 1912(d). Second, a state court may not involuntarily terminate parental rights to an Indian child "in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is *2558 likely to result in serious emotional or physical damage to the child." § 1912(f). Third, with respect to adoptive placements for an Indian child under state law, "a preference shall be given, in the absence of good cause to the contrary, to a placement with (1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families." § 1915(a).
II
In this case, Birth Mother (who is predominantly Hispanic) and Biological Father (who is a member of the Cherokee Nation) became engaged in December 2008. One month later, Birth Mother informed Biological Father, who lived about four hours away, that she was pregnant. After learning of the pregnancy, Biological Father asked Birth Mother to move up the date of the wedding. He also refused to provide any financial support until after the two had married. The couple's relationship deteriorated, and Birth Mother broke off the engagement in May 2009. In June, Birth Mother sent Biological Father a text message asking if he would rather pay child support or relinquish his parental rights. Biological Father responded via text message that he relinquished his rights.
Birth Mother then decided to put Baby Girl up for adoption. Because Birth Mother believed that Biological Father *644 had Cherokee Indian heritage, her attorney contacted the Cherokee Nation to determine whether Biological Father was formally enrolled. The inquiry letter misspelled Biological Father's first name and incorrectly stated his birthday, and the Cherokee Nation responded that, based on the information provided, it could not verify Biological Father's membership in the tribal records.
Working through a private adoption agency, Birth Mother selected Adoptive Couple, non-Indians living in South Carolina, to adopt Baby Girl. Adoptive Couple supported Birth Mother both emotionally and financially throughout her pregnancy. Adoptive Couple was present at Baby Girl's birth in Oklahoma on September 15, 2009, and Adoptive Father even cut the umbilical cord. The next morning, Birth Mother signed forms relinquishing her parental rights and consenting to the adoption. Adoptive Couple initiated adoption proceedings in South Carolina a few days later, and returned there with Baby Girl. After returning to South Carolina, Adoptive Couple allowed Birth Mother to visit and communicate with Baby Girl.
It is undisputed that, for the duration of the pregnancy and the first four months after Baby Girl's birth, Biological Father provided no financial assistance to Birth Mother or Baby Girl, even though he had the ability to do so. Indeed, Biological Father "made no meaningful attempts to assume his responsibility of parenthood" during this period. App. to Pet. for Cert. 122a (Sealed; internal quotation marks omitted).
Approximately four months after Baby Girl's birth, Adoptive Couple served Biological Father with notice of the pending adoption. (This was the first notification that they had provided to Biological Father regarding the adoption proceeding.) Biological Father signed papers stating that he accepted service and that he was "not contesting the adoption." App. 37. But Biological Father later testified that, at the time he signed the papers, he thought that he was *645 relinquishing his rights to Birth Mother, not to Adoptive Couple.
Biological Father contacted a lawyer the day after signing the papers, and subsequently *2559 requested a stay of the adoption proceedings.[2] In the adoption proceedings, Biological Father sought custody and stated that he did not consent to Baby Girl's adoption. Moreover, Biological Father took a paternity test, which verified that he was Baby Girl's biological father.
A trial took place in the South Carolina Family Court in September 2011, by which time Baby Girl was two years old. 398 S.C. 625, 634-635, 731 S.E.2d 550, 555-556 (2012). The Family Court concluded that Adoptive Couple had not carried the heightened burden under § 1912(f) of proving that Baby Girl would suffer serious emotional or physical damage if Biological Father had custody. See id., at 648-651, 731 S.E.2d, at 562-564. The Family Court therefore denied Adoptive Couple's petition for adoption and awarded custody to Biological Father. Id., at 629, 636, 731 S.E.2d, at 552, 556. On December 31, 2011, at the age of 27 months, Baby Girl was handed over to Biological Father, whom she had never met.[3]
The South Carolina Supreme Court affirmed the Family Court's denial of the adoption and the award of custody to Biological Father. Id., at 629, 731 S.E.2d, at 552. The State Supreme Court first determined that the ICWA applied because the case involved a child custody proceeding relating to an Indian child.
*646 Id., at 637, 643, n. 18, 731 S.E.2d, at 556, 560, n. 18. It also concluded that Biological Father fell within the ICWA's definition of a " 'parent.' " Id., at 644, 731 S.E.2d, at 560. The court then held that two separate provisions of the ICWA barred the termination of Biological Father's parental rights. First, the court held that Adoptive Couple had not shown that "active efforts ha[d] been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family." § 1912(d) ; see also id., at 647-648, 731 S.E.2d, at 562.Second, the court concluded that Adoptive Couple had not shown that Biological Father's "custody of Baby Girl would result in serious emotional or physical harm to her beyond a reasonable doubt." Id., at 648-649, 731 S.E.2d, at 562-563 (citing § 1912(f) ). Finally, the court stated that, even if it had decided to terminate Biological Father's parental rights, § 1915(a)'s adoption-placement preferences would have applied. Id., at 655-657, 731 S.E.2d, at 566-567. We granted certiorari. 568 U.S. ----, 133 S.Ct. 831, 184 L.Ed.2d 646 (2013).
III
It is undisputed that, had Baby Girl not been 3/256 Cherokee, Biological Father would have had no right to object to her adoption under South Carolina law. See Tr. of Oral Arg. 49; 398 S.C., at 644, n. 19, 731 S.E.2d, at 560, n. 19 ("Under state law, [Biological] Father's consent to the adoption would not have been required"). The South Carolina Supreme Court held, however, that Biological Father is a "parent" under the ICWA and that two statutory provisions-namely, § 1912(f) and § 1912(d) -bar the termination of his parental rights. In this Court, Adoptive Couple contends that Biological Father is not a "parent" and that § 1912(f) and *2560 § 1912(d) are inapplicable. We need not-and therefore do not-decide whether Biological Father is a "parent." See § 1903(9) (defining "parent").[4] Rather, assuming for the sake of *647 argument that he is a "parent," we hold that neither § 1912(f) nor § 1912(d) bars the termination of his parental rights.
A
Section 1912(f) addresses the involuntary termination of parental rights with respect to an Indian child. Specifically, § 1912(f) provides that "[n]o termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, ... that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." (Emphasis added.) The South Carolina Supreme Court held that Adoptive Couple failed to satisfy § 1912(f) because they did not make a heightened showing that Biological Father's "prospective legal and physical custody" would likely result in serious damage to the child. 398 S.C., at 651, 731 S.E.2d, at 564 (emphasis added). That holding was error.
Section 1912(f) conditions the involuntary termination of parental rights on a showing regarding the merits of "continued custody of the child by the parent." (Emphasis added.) The adjective "continued" plainly refers to a pre-existing state. As Justice SOTOMAYOR concedes, post, at 2577 - 2578 (dissenting opinion) (hereinafter the dissent), "continued" means "[c]arried on or kept up without cessation" or "[e]xtended in space without interruption or breach of conne[ct]ion." Compact Edition of the Oxford English Dictionary 909 (1981 reprint of 1971 ed.) (Compact OED); see also American Heritage Dictionary 288 (1981) (defining "continue" in the following manner: "1. To go on with a particular action or in a particular condition; persist.... 3. To remain in the same state, capacity, or place"); Webster's Third New International Dictionary 493 (1961) (Webster's) (defining "continued"
*648 as "stretching out in time or space esp. without interruption"); Aguilar v. FDIC, 63 F.3d 1059, 1062 (C.A.11 1995) (per curiam ) (suggesting that the phrase "continue an action" means "go on with ... an action" that is "preexisting"). The term "continued" also can mean "resumed after interruption." Webster's 493; see American Heritage Dictionary 288. The phrase "continued custody" therefore refers to custody that a parent already has (or at least had at some point in the past). As a result, § 1912(f) does not apply in cases where the Indian parent never had custody of the Indian child.[5]
Biological Father's contrary reading of § 1912(f) is nonsensical. Pointing to the provision's requirement that "[n]o termination of parental rights may be ordered ... in the absence of a determination" relating to "the continued custody of the *2561 child by the parent," Biological Father contends that if a determination relating to "continued custody" is inapposite in cases where there is no "custody," the statutory text prohibits termination. See Brief for Respondent Birth Father 39. But it would be absurd to think that Congress enacted a provision that permits termination of a custodial parent's rights, while simultaneously prohibiting termination of a noncustodial parent's rights. If the statute draws any distinction between custodial and noncustodial parents, that distinction surely does not provide greater protection for noncustodial parents.[6] *649 Our reading of § 1912(f) comports with the statutory text demonstrating that the primary mischief the ICWA was designed to counteract was the unwarranted removal of Indian children from Indian families due to the cultural insensitivity and biases of social workers and state courts. The statutory text expressly highlights the primary problem that the statute was intended to solve: "an alarmingly high percentage of Indian families [were being] broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies." § 1901(4) (emphasis added); see also § 1902 (explaining that the ICWA establishes " minimum Federal standards for the removal of Indian children from their families" (emphasis added)); Holyfield, 490 U.S., at 32-34, 109 S.Ct. 1597. And if the legislative history of the ICWA is thought to be relevant, it further underscores that the Act was primarily intended to stem the unwarranted removal of Indian children from intact Indian families. See, e.g., H.R.Rep. No. 95-1386, p. 8 (1978) (explaining that, as relevant here, "[t]he purpose of [the ICWA] is to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by establishing minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes" (emphasis added)); id., at 9 (decrying the "wholesale separation of Indian children" from their Indian families); id., at 22 (discussing "the removal" of Indian children from their parents pursuant to §§ 1912(e) and (f) ). In sum, when, as here, the adoption of an Indian child is voluntarily and lawfully initiated by a non-Indian parent with sole custodial rights, the ICWA's primary goal of preventing the unwarranted removal of Indian children and the dissolution of Indian families is not implicated. *650 The dissent fails to dispute that nonbinding guidelines issued by the Bureau of Indian Affairs (BIA) shortly after the ICWA's enactment demonstrate that the BIA envisioned that § 1912(f)'s standard would apply only to termination of a custodial parent's rights. Specifically, the BIA stated that, under § 1912(f), "[a] child may not be removed simply because there is someone else willing to raise the child who is likely to do a better job"; instead, "[i]t must be shown that ... it is dangerous for the child to remain with his or her present custodians." Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed.Reg. 67593 (1979) (emphasis added) (hereinafter Guidelines). Indeed, the Guidelines recognized that § 1912(f) applies only when there is pre-existing custody to evaluate. *2562 See ibid. ("[T]he issue on which qualified expert testimony is required is the question of whether or not serious damage to the child is likely to occur if the child is not removed").
Under our reading of § 1912(f), Biological Father should not have been able to invoke § 1912(f) in this case, because he had never had legal or physical custody of Baby Girl as of the time of the adoption proceedings. As an initial matter, it is undisputed that Biological Father never had physical custody of Baby Girl. And as a matter of both South Carolina and Oklahoma law, Biological Father never had legal custody either. See S.C.Code Ann. § 63-17-20(B) (2010) ("Unless the court orders otherwise, the custody of an illegitimate child is solely in the natural mother unless the mother has relinquished her rights to the child"); Okla. Stat., Tit. 10, § 7800 (West Cum.Supp. 2013) ("Except as otherwise provided by law, the mother of a child born out of wedlock has custody of the child until determined otherwise by a court of competent jurisdiction").[7]
*651 In sum, the South Carolina Supreme Court erred in finding that § 1912(f) barred termination of Biological Father's parental rights.
B
Section 1912(d) provides that "[a]ny party" seeking to terminate parental rights to an Indian child under state law "shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." (Emphasis added.) The South Carolina Supreme Court found that Biological Father's parental rights could not be terminated because Adoptive Couple had not demonstrated that Biological Father had been provided remedial services in accordance with § 1912(d). 398 S.C., at 647-648, 731 S.E.2d, at 562. We disagree.
Consistent with the statutory text, we hold that § 1912(d) applies only in cases where an Indian family's "breakup" would be precipitated by the termination of the parent's rights. The term "breakup" refers in this context to "[t]he discontinuance of a relationship," American Heritage Dictionary 235 (3d ed. 1992), or "an ending as an effective entity," Webster's 273 (defining "breakup" as "a disruption or dissolution into component parts: an ending as an effective entity"). See also Compact OED 1076 (defining "break-up" as, inter alia, a "disruption, separation into parts, disintegration"). But when an Indian parent abandons an Indian child prior to birth and that child has never been in the Indian parent's legal or physical custody, there is no "relationship" that would be "discontinu[ed]"-and no "effective *652 entity" that would be "end[ed]"-by the termination of the Indian parent's rights. In such a situation, the "breakup of the Indian family" has long since occurred, and § 1912(d) is inapplicable. *2563 Our interpretation of § 1912(d) is, like our interpretation of § 1912(f), consistent with the explicit congressional purpose of providing certain "standards for the removal of Indian children from their families." § 1902 (emphasis added); see also, e.g., § 1901(4) ; Holyfield, 490 U.S., at 32-34, 109 S.Ct. 1597. In addition, the BIA's Guidelines confirm that remedial services under § 1912(d) are intended "to alleviate the need to remove the Indian child from his or her parents or Indian custodians," not to facilitate a transfer of the child to an Indian parent. See 44 Fed.Reg., at 67592 (emphasis added).
Our interpretation of § 1912(d) is also confirmed by the provision's placement next to § 1912(e) and § 1912(f), both of which condition the outcome of proceedings on the merits of an Indian child's "continued custody" with his parent. That these three provisions appear adjacent to each other strongly suggests that the phrase "breakup of the Indian family" should be read in harmony with the "continued custody" requirement. See United Sav. Assn. of Tex. v. Timbers of Inwood Forest Associates, Ltd., 484 U.S. 365, 371, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988) (explaining that statutory construction "is a holistic endeavor" and that "[a] provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme"). None of these three provisions creates parental rights for unwed fathers where no such rights would otherwise exist. Instead, Indian parents who are already part of an "Indian family" are provided with access to "remedial services and rehabilitative programs" under § 1912(d) so that their "custody" might be "continued" in a way that avoids foster-care placement under § 1912(e) or termination of parental rights under § 1912(f). In other words, the provision of "remedial services and rehabilitative programs" under § 1912(d) supports *653 the "continued custody" that is protected by § 1912(e) and § 1912(f).[8]
Section 1912(d) is a sensible requirement when applied to state social workers who might otherwise be too quick to remove Indian children from their Indian families. It would, however, be unusual to apply § 1912(d) in the context of an Indian parent who abandoned a child prior to birth and who never had custody of the child. The decision below illustrates this point. The South Carolina Supreme Court held that § 1912(d) mandated measures such as "attempting to stimulate [Biological] Father's desire to be a parent." 398 S.C., at 647, 731 S.E.2d, at 562. But if prospective adoptive parents were required to engage in the bizarre undertaking of "stimulat[ing]" a biological father's "desire to be a parent," it would surely dissuade some of them from seeking to *2564 adopt Indian children.[9] And this would, in turn, unnecessarily place vulnerable Indian children at a unique *654 disadvantage in finding a permanent and loving home, even in cases where neither an Indian parent nor the relevant tribe objects to the adoption.[10]
In sum, the South Carolina Supreme Court erred in finding that § 1912(d) barred termination of Biological Father's parental rights.
IV
In the decision below, the South Carolina Supreme Court suggested that if it had terminated Biological Father's rights, then § 1915(a)'s preferences for the adoptive placement of an Indian child would have been applicable. 398 S.C., at 655-657, 731 S.E.2d, at 566-567. In so doing, however, the court failed to recognize a critical limitation on the scope of § 1915(a).
Section 1915(a) provides that "[i]n any adoptive placement of an Indian child under State law, a preference shall be given, in the absence of good cause to the contrary, to a placement with (1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families." Contrary to the South Carolina Supreme Court's suggestion, § 1915(a)'s preferences are inapplicable in cases where no alternative party has formally sought to adopt the child. This is because there simply is no "preference" to apply if no alternative party that is eligible to be preferred under § 1915(a) has come forward.
In this case, Adoptive Couple was the only party that sought to adopt Baby Girl in the Family Court or the South Carolina Supreme Court. See Brief for Petitioners 19, 55; Brief for Respondent Birth Father 48; Reply Brief for Petitioners 13. Biological Father is not covered by § 1915(a) because he did not seek to adopt Baby Girl; instead, he argued that his parental rights should not be terminated in the first *655 place.[11] Moreover, Baby Girl's paternal grandparents never sought custody of Baby Girl. See Brief for Petitioners 55; Reply Brief for Petitioners 13; 398 S.C., at 699, 731 S.E.2d, at 590 (Kittredge, J., dissenting) (noting that the "paternal grandparents are not parties to this action"). Nor did other members of the Cherokee Nation or "other Indian families" seek to adopt Baby Girl, even though the Cherokee Nation had notice of-and intervened in-the adoption proceedings. See Brief *2565 for Respondent Cherokee Nation 21-22; Reply Brief for Petitioners 13-14.[12]
The Indian Child Welfare Act was enacted to help preserve the cultural identity and heritage of Indian tribes, but under the State Supreme Court's reading, the Act would put certain vulnerable children at a great disadvantage solely because an ancestor-even a remote one-was an Indian. As the State Supreme *656 Court read §§ 1912(d) and (f), a biological Indian father could abandon his child in utero and refuse any support for the birth mother-perhaps contributing to the mother's decision to put the child up for adoption-and then could play his ICWA trump card at the eleventh hour to override the mother's decision and the child's best interests. If this were possible, many prospective adoptive parents would surely pause before adopting any child who might possibly qualify as an Indian under the ICWA. Such an interpretation would raise equal protection concerns, but the plain text of §§ 1912(f) and (d) makes clear that neither provision applies in the present context. Nor do § 1915(a)'s rebuttable adoption preferences apply when no alternative party has formally sought to adopt the child. We therefore reverse the judgment of the South Carolina Supreme Court and remand the case for further proceedings not inconsistent with this opinion.
It is so ordered.

It is undisputed that Baby Girl is an "Indian child" as defined by the ICWA because she is an unmarried minor who "is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe," § 1903(4)(b). See Brief for Respondent Birth Father 1, 51, n. 22; Brief for Respondent Cherokee Nation 1; Brief for Petitioners 44 ("Baby Girl's eligibility for membership in the Cherokee Nation depends solely upon a lineal blood relationship with a tribal ancestor"). It is also undisputed that the present case concerns a "child custody proceeding," which the ICWA defines to include proceedings that involve "termination of parental rights" and "adoptive placement," § 1903(1).

Around the same time, the Cherokee Nation identified Biological Father as a registered member and concluded that Baby Girl was an "Indian child" as defined in the ICWA. The Cherokee Nation intervened in the litigation approximately three months later.

According to the guardian ad litem, Biological Father allowed Baby Girl to speak with Adoptive Couple by telephone the following day, but then cut off all communication between them. Moreover, according to Birth Mother, Biological Father has made no attempt to contact her since the time he took custody of Baby Girl.

If Biological Father is not a "parent" under the ICWA, then § 1912(f) and § 1912(d) -which relate to proceedings involving possible termination of "parental" rights-are inapplicable. Because we conclude that these provisions are inapplicable for other reasons, however, we need not decide whether Biological Father is a "parent."

With a torrent of words, the dissent attempts to obscure the fact that its interpretation simply cannot be squared with the statutory text. A biological father's "continued custody" of a child cannot be assessed if the father never had custody at all, and the use of a different phrase-"termination of parental rights"-cannot change that. In addition, the dissent's reliance on subsection headings, post, at 2560 - 2561, overlooks the fact that those headings were not actually enacted by Congress. See 92 Stat. 3071-3072.

The dissent criticizes us for allegedly concluding that a biological father qualifies for "substantive" statutory protections "only when [he] has physical or state-recognized legal custody." Post, at 2572 - 2573, 2574 - 2575. But the dissent undercuts its own point when it states that "numerous" ICWA provisions not at issue here afford "meaningful" protections to biological fathers regardless of whether they ever had custody. Post, at 2573 - 2575, and nn. 1, 2.

In an effort to rebut our supposed conclusion that "Congress could not possibly have intended" to require legal termination of Biological Father's rights with respect to Baby Girl, the dissent asserts that a minority of States afford (or used to afford) protection to similarly situated biological fathers. See post, at 2580 - 2581, and n. 12 (emphasis added). This is entirely beside the point, because we merely conclude that, based on the statute's text and structure, Congress did not extend the heightened protections of § 1912(d) and § 1912(f) to all biological fathers. The fact that state laws may provide certain protections to biological fathers who have abandoned their children and who have never had custody of their children in no way undermines our analysis of these two federal statutory provisions.

The dissent claims that our reasoning "necessarily extends to all Indian parents who have never had custody of their children," even if those parents have visitation rights. Post, at 2572 - 2573, 2578 - 2579. As an initial matter, the dissent's concern about the effect of our decision on individuals with visitation rights will be implicated, at most, in a relatively small class of cases. For example, our interpretation of § 1912(d) would implicate the dissent's concern only in the case of a parent who abandoned his or her child prior to birth and never had physical or legal custody, but did have some sort of visitation rights. Moreover, in cases where this concern is implicated, such parents might receive "comparable" protections under state law. See post, at 2579 - 2580. And in any event, it is the dissent's interpretation that would have far-reaching consequences: Under the dissent's reading, any biological parent-even a sperm donor-would enjoy the heightened protections of § 1912(d) and § 1912(f), even if he abandoned the mother and the child immediately after conception. Post, at 2579, n. 8.

Biological Father and the Solicitor General argue that a tribe or state agency could provide the requisite remedial services under § 1912(d). Brief for Respondent Birth Father 43; Brief for United States as Amicus Curiae 22. But what if they don't? And if they don't, would the adoptive parents have to undertake the task?

The dissent repeatedly mischaracterizes our opinion. As our detailed discussion of the terms of the ICWA makes clear, our decision is not based on a "[p]olicy disagreement with Congress' judgment." Post, at 2572 - 2573; see also post, at 2575 - 2576, 2583.

Section 1915(c) also provides that, in the case of an adoptive placement under § 1915(a), "if the Indian child's tribe shall establish a different order of preference by resolution, the agency or court effecting the placement shall follow such order so long as the placement is the least restrictive setting appropriate to the particular needs of the child, as provided in [§ 1915(b) ]." Although we need not decide the issue here, it may be the case that an Indian child's tribe could alter § 1915's preferences in a way that includes a biological father whose rights were terminated, but who has now reformed. See § 1915(c). If a tribe were to take such an approach, however, the court would still have the power to determine whether "good cause" exists to disregard the tribe's order of preference. See §§ 1915(a), (c) ; In re Adoption of T.R.M., 525 N.E.2d 298, 313 (Ind.1988).

To be sure, an employee of the Cherokee Nation testified that the Cherokee Nation certifies families to be adoptive parents and that there are approximately 100 such families "that are ready to take children that want to be adopted." Record 446. However, this testimony was only a general statement regarding the Cherokee Nation's practices; it did not demonstrate that a specific Indian family was willing to adopt Baby Girl, let alone that such a family formally sought such adoption in the South Carolina courts. See Reply Brief for Petitioners 13-14; see also Brief for Respondent Cherokee Nation 21-22.
* * *