2013 OK 75

Dusten BROWN and The Cherokee Nation, Petitioners,

v.

The Honorable Curtis DeLAPP, Respondent.

No. 112116.

Supreme Court of Oklahoma.

Sept. 23, 2013.

¶0 ORDER DECLINING TO ASSUME ORIGINAL JURISDICTION AND DISSOLVING EMERGENCY STAY.

¶1 Petitioners, Dusten Brown and the Cherokee Nation, filed in this Court a joint application for the issuance of an extraordinary writ of prohibition to prevent enforcement of an order issued by the District Court of Nowata County, the Honorable Curtis De-Lapp, which granted registration in the Oklahoma District Court of Custody and Enforcement Orders entered by the Family Court of the 9th Judicial District of the State of South Carolina.

¶2 On August 30, 2013, an Emergency Stay was issued by the Court to prevent, during the pendency of this proceeding, enforcement of the order of the District Court of Nowata County Cause No. FA–2013–4 "to the extent that it orders immediate delivery of the child to the Adoptive Couple." Supreme Court Order, Cause No. 112,116, Aug, 30, 2013.

¶3 The joint application for a petition for issuance of an extraordinary supervisory writ of prohibition to the judge of the District Court of Nowata County is DENIED. Okla. Const. Art. 7 § 4.

¶4 The Emergency Stay issued by this Court herein on August 30, 2013, is hereby DISSOLVED, and of no effect, effective the date this Order is filed with the Clerk of this Court. Okla. Const. Art. 7 § 4.

¶5 **DONE BY ORDER OF THE SUPREME COURT IN CONFERENCE THIS 23rd DAY OF SEPTEMBER, 2013.**

CONCUR: KAUGER, WATT, WINCHESTER, EDMONDSON, COMBS, JJ.

DISSENT: REIF, V.C.J., GURICH, J.

CONCUR IN PART AND DISSENT IN PART: COLBERT, C.J.

NOT VOTING: TAYLOR, J.

REIF, V.C.J., dissenting:

¶1 I respectfully dissent to the denial of the application to assume original jurisdiction and the vacation of the emergency stay.

¶2 Unwed father Dusten Brown and the Cherokee Nation ask this Court to assume original jurisdiction and to deny full faith and credit to a South Carolina adoption decree. This decree allowed the adoption of Mr. Brown's daughter, Veronica, without his consent and over the objection of the Cherokee Nation. The adoption decree is the culmination of protracted litigation between Mr. Brown and the Cherokee Nation on the one hand, and the Adoptive Parents and the consenting biological mother on the other.

¶3 The history of the litigation between the parties is recounted in two published opinions by the South Carolina Supreme Court—*Adoptive Couple v. Baby Girl*, 398 S.C. 625, 731 S.E.2d 550 (2012); *Adoptive Couple v. Baby Girl* [*Adoptive Couple II* ], 404 S.C. 483, 746 S.E.2d 51 (2013)—and a published opinion of the United States Supreme Court, *Adoptive Couple v. Baby Girl*, —— U.S. ——, 133 S.Ct. 2552, 186 L.Ed.2d 729 (2013). These opinions are not only important for the history of the case, but because they form the settled law of the case on all issues, including the necessity of Mr. Brown's consent to the adoption.

¶4 Briefly, the first opinion of the South Carolina Supreme Court applied the doctrine of law of the case in determining South Carolina was Veronica's "home state," rather than Oklahoma where she was born. *See Adoptive Couple*, 731 S.E.2d at 559. This opinion also noted that the adoption could take place under South Carolina law without Mr. Brown's consent, *if not* for his status as an "Indian parent" under the federal Indian Child Welfare Act, 25 U.S.C. §§ 1901

through 1963. The South Carolina Supreme Court refused to allow the adoption without Mr. Brown's consent because the requirements of sections 1912(d) and (f) of the federal Indian Child Welfare Act were not met.[1]

¶5 The United States Supreme Court granted certiorari to review the South Carolina Supreme Court's interpretation of the federal Indian Child Welfare Act as applied to Mr. Brown's parental rights. The United States Supreme Court ruled that the federal Indian Child Welfare Act did not apply to Mr. Brown's parental rights. The Court reached this conclusion because Mr. Brown (1) never had physical or legal custody of Veronica, and (2) had made no meaningful attempts to assume his responsibility of parenthood during Mother's pregnancy or in the four-month period after Veronica's birth and prior to the filing of the adoption proceeding. The United States Supreme Court reversed the judgment of the South Carolina Supreme Court and remanded for further proceedings not inconsistent with the United States Supreme Court's opinion.

¶6 In its opinion on remand from the United States Supreme Court, the South Carolina Supreme Court noted "our previous decision ... held that, under state law, [Mr. Brown's] consent to the adoption was not required." *Adoptive Couple II*, 746 S.E.2d at 53 (citing *Adoptive Couple*, 731 S.E.2d at 560, n. 19.) South Carolina statutory law requires the consent of an unwed father in adoption placements within six months or less after the child's birth, *only if* (1) the father lived with the child or the child's mother is in the six month period prior to the adoption placement, or (2) the father paid a fair and reasonable support of the child or the expenses of the mother's pregnancy. Oklahoma has a statute that provides that an unwed father's consent to adoption is not required in similar circumstances.[2]

¶7 Under this settled law of the case, Mr. Brown's consent to the South Carolina adoption of Veronica was not required, and would not have been required even if the adoption had been pursued under Oklahoma law. However, this settled law of the case issue alone does not compel this Court to recognize the South Carolina adoption decree *in toto* under 10 O.S.2011 § 7505–1.4 or to give it full faith and credit. Other settled law of the case also protects the interests of Veronica as an "Indian child," independent of the interests of Mr. Brown or any of the other parties to this case.

¶8 The South Carolina Supreme Court stated: "Where an Indian child's best inter-

---

1. Title 25 U.S.C. § 1912(d) provides:
Remedial services and rehabilitative programs; preventive measures
Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.
and 25 U.S.C. § 1912(f) provides:
Parental rights termination orders; evidence; determination of damage to child
No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

2. Title 10 O.S.2011 § 7505–4.2, states:
C. Consent to adoption is not required from a father or putative father of a minor born out of wedlock if:

1. The minor is placed for adoption within ninety (90) days of birth, and the father or putative father fails to show he has exercised parental rights or duties towards the minor, including, but not limited to, failure to contribute to the support of the mother of the child to the extent of his financial ability during her term of pregnancy; or
2. The minor is placed for adoption within fourteen (14) months of birth, and the father or putative father fails to show that he has exercised parental rights or duties towards the minor, including, but not limited to, failure to contribute to the support of the minor to the extent of his financial ability, which may include consideration of his failure to contribute to the support of the mother of the child to the extent of his financial ability during her term of pregnancy. Failure to contribute to the support of the mother during her term of pregnancy shall not in and of itself be grounds for finding the minor eligible for adoption without such father's consent.
The incarceration of a parent in and of itself shall not prevent the adoption of a minor without consent.

ests are at stake, [an] inquiry into that child's best interests must also account for his or her status as an Indian child, and therefore, must also inquire into whether the placement is in the best interests of the *Indian child*." *Adoptive Couple*, 731 S.E.2d at 565 (emphasis in original). The South Carolina Supreme Court further observed that: "In making this determination, the child's relationship with his or her tribe is an important consideration, as the [federal Indian Child Welfare Act] is 'based on the fundamental assumption that it is in the Indian child's best interest that [his or her] relationship to the tribe be protected.'" *Id.* As specifically applied to Veronica, the South Carolina Supreme Court held that "[she], as an Indian child, has a strong interest in retaining ties to her cultural heritage." *Id.*

¶ 9 The South Carolina Supreme Court not only said that this special best interests inquiry and determination *must* be made in this case, but also emphasized that "'[when] parental rights and the best interests of the child are in conflict, the best interests of the child must prevail.'" *Adoptive Couple*, 731 S.E.2d at 566 (quoting the family court order). At the very least, this calls for accommodation of Veronica's "strong interest in her cultural heritage" with the parental rights of the Adoptive Parents.

¶ 10 Nothing in the United States Supreme Court opinion states or even hints that this protection of Veronica as an Indian Child under the federal Indian Child Welfare Act was not correct or could not be applied as law of the case on remand. Nothing in the opinion of the South Carolina Supreme Court on remand or in the family court adoption decree reflects that this special best interests inquiry and determination were made in finalizing the adoption.

¶ 11 Veronica was entitled to this special best interests inquiry and determination under the settled law of the case and as a matter of due process. To the extent that the South Carolina adoption decree denied Veronica due process, it is not entitled to recognition under 10 O.S.2011 § 7502–1.4, or under the Full Faith and Credit Clause.

¶ 12 In addition to Veronica's interests, the Cherokee Nation has been a party to all of the proceedings in the courts of South Carolina, in the United States Supreme Court, and in the courts of this State. As such, the Cherokee Nation has a direct and substantial interest in seeing that Veronica's rights as an Indian child and member of the Cherokee Nation are fully protected, including the right to the special best interests determination under the law of the case. It would be virtually impossible for any court to make this special best interests determination without hearing from the Cherokee Nation.

¶ 13 The denial of due process to Veronica and the Cherokee Nation warrant the exercise of this Court's original jurisdiction in the enforcement of the South Carolina decree. The totality of the circumstances surrounding this case also call for this Court to fashion a remedy for such denial, while at the same time recognizing the finality of the South Carolina adoption decree insofar as the rights of Mr. Brown, the Adoptive Parents and the consenting birth mother are concerned.

¶ 14 The submission of the South Carolina adoption decree to the courts of this State for enforcement invokes, at a minimum, the due process protection of Oklahoma law. In addition, Oklahoma and South Carolina have mutual interests in seeing this case brought to finality. The only way to do this is to treat fulfillment of the special best interests determination as a condition to the enforcement of the decree. Because all the parties are before this Court, and all parties are aware of and bound by this law of the case requirement, this Court is a proper forum for the special best interests inquiry and determination.

¶ 15 This Court should first assume original jurisdiction and continue the emergency stay. Second, this Court should consolidate the appeal from the Cherokee County habeas corpus proceeding with this original proceeding and extend the emergency stay to that proceeding as well. Third, this Court should appoint a retired active judge as special master to hear the parties on the issue of Veronica's best interests as an Indian Child and member of the Cherokee Nation, including continued contact with the members of her

Cherokee family. This Court should allow the parties two days to agree upon a retired active judge and, if they cannot do so, instruct them to submit objections to any of the retired active judges serving as special master in that same time frame. Fourth, this Court should instruct the special master to conduct the hearing within five days of the order appointing the special master and to submit recommendations to this Court within five days of the hearing. Last, upon receipt of the special master's report, this Court should forthwith enter a determination concerning Veronica's best interests as an Indian Child and member of the Cherokee Nation. This determination should be set forth in an order that recognizes the adoption decree under § 7502–1.4 and gives it full faith and credit; such determination being subject to modification by an appropriate court of South Carolina upon a showing of changed conditions.

GURICH, J., dissenting:

¶ 1 The single most important consideration in this long and drawn out litigation is the *best interests of Baby Girl.* The legal issue currently before this Court is whether the Parental Kidnapping Prevention Act, 28 U.S.C. § 1738A et seq., requires Oklahoma courts to recognize and enforce the custody determination contained in an adoption decree entered in the State of South Carolina. Oklahoma courts have been asked to facilitate enforcement of this adoption decree and to grant custody to Adoptive Couple despite the fact that since December of 2011 Baby Girl has resided in Oklahoma with her Father pursuant to a South Carolina court order. More importantly, South Carolina courts failed to hold any kind evidentiary hearing concerning the best interests of Baby Girl and the likelihood of psychological harm to the child resulting from a severance of the parent-child relationship. Additionally, Father's parental rights were terminated without out proper notice and an opportunity to be heard. Everything in the life of Baby Girl has changed since 2011, and therefore, I cannot join the majority's decision to dissolve the temporary stay and to deny original jurisdiction.[1] Although this is a complicated case, we should accept our legal responsibility to follow established law in making a determination having such a profound impact on the life of this child.

### Facts & Procedural History

¶ 2 The specific facts of this case were discussed in detail in the opinions from both the South Carolina Supreme Court, *see Adoptive Couple v. Baby Girl,* 398 S.C. 625, 731 S.E.2d 550 (S.C.2012) and the U.S. Supreme Court, *see Adoptive Couple v. Baby Girl,* —— U.S. ——, 133 S.Ct. 2552, 186 L.Ed.2d 729 (2013). In short, after Baby Girl's birth Adoptive Couple removed the child to South Carolina and filed a petition for adoption in South Carolina. The Cherokee Nation was not given notice of Baby Girl's birth before she was removed from the state. Father received notice of the adoption proceedings in January of 2010.[2] The Cherokee Nation filed a Notice of Intervention in the South Carolina action in April of 2010.[3] In May of 2010, Father filed an answer in the South Carolina adoption proceeding, stating he did not consent to the adoption of Baby Girl. He contested the adoption and sought custody of Baby Girl.

¶ 3 After a four-day hearing in September 2011, the South Carolina Family Court issued a final order on November 25, 2011, finding that the Indian Child Welfare Act applied to the case, the Father did not volun-

---

1. Baby Girl celebrated her fourth birthday on September 15, 2013.

2. Father received notice of the adoption proceedings approximately four months after Baby Girl's birth. A process server presented Father "legal papers entitled 'Acceptance of Service and Answer of Defendant,' which stated he was not contesting the adoption of Baby Girl and that he waived the thirty day waiting period and notice of the hearing." *Adoptive Couple,* 731 S.E.2d at 555. After consulting with his parents and a JAG lawyer at his military base, Father contacted a lawyer the next day and began contesting the adoption. *Id.*

3. "Since subject matter jurisdiction concerns the competency of the court to determine the particular matter, it cannot be waived by the parties or conferred upon the court by their consent and it may be challenged at any time in the course of the proceedings." *In re A.N.O.,* 2004 OK 33, ¶ 9, 91 P.3d 646, 649.

tarily consent to the termination of his parental rights or the adoption, and that the Adoptive Couple failed to prove by clear and convincing evidence that Father's parental rights should be terminated or that granting custody of Baby Girl to Father would likely result in serious emotional or physical damage to Baby Girl.[4] The trial court found that Father **"was a fit and proper person to have custody of Baby Girl and there was no conflict between the best interest of the child and parental rights."**[5] The trial court denied the adoption petition and ordered the Adoptive Couple to transfer the child to her Father.

¶ 4 Transfer of custody took place in Charleston, South Carolina, on December 31, 2011. Baby Girl has resided with her Father and his parents in Oklahoma since that time. Adoptive Couple appealed to the South Carolina Supreme Court. The South Carolina Supreme Court affirmed and found that the intent of ICWA was accomplished by denying the adoption petition and dismissing the case. *Adoptive Couple*, 398 S.C. at 641, 731 S.E.2d 550. It also affirmed the trial court's decision that it was in the best interests of Baby Girl to transfer custody to her Father. *Id.* at 655, 731 S.E.2d 550.

### U.S. Supreme Court Opinion

¶ 5 The Adoptive Couple sought certiorari review in the U.S. Supreme Court, and in a 5–4 decision, the U.S. Supreme Court held that Sections 1912(f) and 1912(d) of ICWA did not bar the termination of Father's parental rights:

> [W]e hold that 25 U.S.C. § 1912(f)—which bars involuntary termination of a parent's rights in the absence of a heightened showing that serious harm to the Indian child is likely to result from the parent's "continued custody" of the child—does not apply when, as here, the relevant parent never had custody of the child. We further hold that § 1912(d)—which conditions involuntary termination of parental rights with respect to an Indian child on a showing that remedial efforts have been made to prevent the "breakup of the Indian family"—is inapplicable when, as here, the parent abandoned the Indian child before birth and never had custody of the child. Finally, we clarify that § 1915(a), which provides placement preferences for the adoption of Indian children, does not bar a non-Indian family like Adoptive Couple from adopting an Indian child when no other eligible candidates have sought to adopt the child.[6]

*Adoptive Couple*, 133 S.Ct. at 2557.

¶ 6 The majority opinion recognized that "Baby Girl is an 'Indian Child' as defined by

---

4. *Adoptive Couple*, 731 S.E.2d at 556.

5. Supplement to First Appendix to Response Brief on Behalf of the Real Party in Interest at 000236 (citing South Carolina Family Court Order, November 25, 2011) (emphasis added).

6. The majority opinion from the U.S. Supreme Court arguably disregards the express Congressional purpose of ICWA. *see* 25 U.S.C. § 1901. Regardless, a narrow reading of the opinion leads to the conclusion that although Sections 1912(f) and 1912(d) of ICWA do not apply in this case, ICWA may still apply to this adoption proceeding because "Baby Girl is an 'Indian child'" and the "case concerns a 'child custody proceeding,' as defined by ICWA to include proceedings that involve 'termination of parental rights' and 'adoptive placement.'" *Adoptive Couple*, 133 S.Ct. at 2557 n. 1. *see also Cherokee Nation v. Nomura*, 2007 OK 40, ¶ 1, 160 P.3d 967, 969 (holding that the Oklahoma Indian Child Welfare Act must be applied to every adoption of Indian children born to an Oklahoma Indian parent, even if the parent chooses out of state non-Indian adoptive parents).

As Justice Sotomayor predicted in her dissent, Section 1915(a)'s adoption-placement preference became applicable after remand from the U.S. Supreme Court. *Adoptive Couple*, 133 S.Ct. at 2585 (Sotomayor, J., dissenting) ("[T]he majority does not and cannot foreclose the possibility that on remand, Baby Girl's paternal grandparents or other members of the Cherokee Nation may formally petition for adoption of Baby Girl.") Baby Girl's grandfather, who is a member of the Cherokee Nation, and grandmother filed a Petition for Guardianship on July 2, 2013, in the Cherokee Nation District Court and asked that in the event Father's rights were terminated, they be allowed to adopt Baby Girl. *see* Petitioners' Index at Joint Brief of Dusten Brown and the Cherokee Nation in Support of Objection to the Recognition Registration and/or Enforcement of the Decree of Adoption and/or Custody Determination at 10. Baby Girl's stepmother and Father also filed a stepparent adoption proceeding on July 1, 2013, in the District Court of Nowata County and asked that in the event Father's parental rights were terminated they be allowed to adopt Baby Girl. *Id.*

the ICWA." *Id.* at 2557 n. 1. The Court also assumed without deciding that Father was a "parent" within the meaning of ICWA. *Id.* at 2560 n. 4. The Court made no mention of the South Carolina Supreme Court's finding that Father was a fit parent, and did not overturn the South Carolina Supreme Court's finding that it was in the best interests of Baby Girl to live with her Father in Oklahoma.

### Remand to the South Carolina Supreme Court

¶ 7 On remand from the U.S. Supreme Court, Father filed a Motion to Remand with the South Carolina Supreme Court, arguing the case should be remanded to the Family Court for a hearing on: 1) whether the case should be transferred to Oklahoma where Baby Girl has lived for almost two years, where the relevant witnesses are all located, and where competing adoption petitions are pending; 2) whether, on the current record, Father's parental rights may be terminated, or whether it is in Baby Girl's best interests for her to remain with the natural parent who has cared for her and with whom she has bonded over those 18 months; and 3) whether, in light of the competing adoption petitions, the ICWA placement preferences preclude adoption of Baby Girl by the Adoptive Couple.[7]

7. See Petitioners' Index at Joint Brief of Dusten Brown and the Cherokee nation in Support of Objection to the Recognition Registration and/or Enforcement of the Decree of Adoption and/or Custody Determination at 10.

8. Two dissenting Justices cautioned against remanding the case without a hearing, suggesting that ICWA's adoptive preference provisions might now be applicable and that **Baby Girl's best interests would not be fully considered without a hearing on remand.** *Id.* (Pleicones, Beatty, JJ., dissenting) ("I would remand but I would not order any specific relief at this juncture, as I believe this is a situation where the decisions that are in the best interests of the child, given all that has happened in her short life, must be sorted out in the lower court(s)").

9. The order entered by the South Carolina Family Court on August 1, 2013, states:
2. *Adoption Decree Entered:* **At the beginning of the hearing, the Court informed the parties that the Decree of Adoption had been issued** as set out in the order of the South Carolina Supreme Court from July 17 and July 24, 2013, **and**

¶ 8 The South Carolina Supreme Court denied Father's motion in its entirety. *Adoptive Couple v. Baby Girl,* 404 S.C. 483, 746 S.E.2d 51, 54 (2013). It remanded the case to the Family Court "for the prompt entry of an order approving and finalizing Adoptive Couple's adoption of Baby Girl, and thereby terminating Birth Father's parental rights."[8] *Id.*

¶ 9 The South Carolina Family Court, as ordered, **held no final hearing** on the adoption and entered the adoption decree in favor of the Adoptive Couple, apparently relying on the record made at the hearing in *September of 2011.* Although there was a hearing held on July 31, 2013, at which Father's attorneys and attorneys for the Cherokee Nation were present, the order from the Family Court indicates the adoption decree had already been entered prior to the hearing.[9] The objections to jurisdiction or change in custodial placement were not addressed on their merits.[10]

### South Carolina's "custody determination" did not comply with the Parental Kidnapping Prevention Act, 28 U.S.C. § 1738A et seq.

¶ 10 I would decline to recognize the adoption decree entered by South Carolina under the Parental Kidnapping Prevention Act, 28 U.S.C. § 1738A et seq.,[11] and issue a writ of

that the parental rights of the natural parents in and to the child were terminated and that the child was the child of the adoptive parents. A copy of the Decree of Adoption was distributed and served upon the parties (the Adoptive Parents, the Birth Father, the Guardian ad Litem, and the Cherokee Indian Nation) by serving same on their attorneys at the beginning of the hearing. Service of the Decree of Adoption is effective on this day of service.
Custody Transition Order at 2 (S.C.Fam.Ct. 9th Jud. Cir. Aug. 1, 2013) (emphasis added).

10. *Id.*

11. "The primary purposes of the PKPA are to: (1) promote cooperation between State courts so that a determination of custody is rendered in the State which can best decide the case in the interest of the child; (2) facilitate the enforcement of custody decrees of sister States; (3) discourage continuing interstate controversies over child custody in the interest of greater stability of home environment and of secure family relationships for the child; and (4) avoid juris-

prohibition directing the trial court to refuse enforcement of the adoption decree. I would find that under the PKPA, the adoption decree is a custody determination [12] and that South Carolina relinquished jurisdiction over Baby Girl by failing to comply with the PKPA.

¶ 11 The PKPA requires the courts of every state to enforce a child custody determination of sister states made *consistently* with the provisions of the Act. 28 U.S.C. § 1738A(e), provides that "[b]efore a child custody or visitation determination is made, *reasonable notice and opportunity to be heard* shall be given to the contestants, *any parent whose parental rights have not been previously terminated and any person who has physical custody of a child.*" 28 U.S.C. § 1738A(e) (emphasis added). Father's parental rights had not been terminated before the entry of the final adoption decree, and as such, under both the PKPA and South Carolina statutes [13] he was entitled to notice and a hearing before such rights were terminated.[14]

dictional competition and conflict between State courts in matters of child custody which have in the past resulted in the shifting of children from State to State with harmful effects on their well-being." *Doe v. Baby Girl*, 376 S.C. 267, 657 S.E.2d 455, 460 (2008) (citing PKPA, Pub.L. No. 96–611, § 7(c) (1980)).

**12.** The phrase custody determination is specifically defined by § 1738A(b)(3) as "a judgment, decree, or other order of a court providing for the custody of a child, and includes permanent and temporary orders, and initial orders and modifications." The majority of courts across the country addressing this issue have concluded that both the PKPA and the UCCJEA apply to adoption proceedings. *See, e.g., In re Adoption of Baby E.Z.*, 266 P.3d 702, 708 (recognizing the majority of jurisdictions apply PKPA to adoptions); *Brookshire v. Blackwell*, 384 S.C. 333, 682 S.E.2d 295, 298 (S.C.Ct.App.2009) (recognizing that both PKPA and UCCJA apply to adoption cases); *In People ex rel A.J.C.*, 88 P.3d 599 (Colo. 2004) (finding custody determinations included adoptions).

**13.** S.C.Code Ann. § 63–9–730 provides in relevant part:
(A) Notice of any proceeding initiated pursuant to this article must be given to the persons or agencies specified in subsection (B) of this section, unless the person has given consent or relinquishment or parental rights have been terminated.
(B) The following persons or agencies are entitled to notice as provided in subsection (A):
(1) a person adjudicated by a court in this State to be the father of the child;
(2) a person or agency required to give consent or relinquishment pursuant to Section 63–9–310(A) or (B) from whom consent or relinquishment cannot be obtained;
. . . .
(F) When notice of intent to contest, intervene, or otherwise respond is filed with the court within the required time period, the person or agency must be given an opportunity to appear and to be heard before the final hearing on the merits of the adoption.
S.C.Code Ann. § 63–9–730.

**14.** Additionally, the South Carolina Adoption Code requires a final hearing before an adoption can be finalized. No final adoption hearing was held upon remand from the U.S. Supreme Court. S.C.Code Ann. § 63–9–750. South Carolina's adoption code, § 63–9–520(A)(1)(b), also provides that "if the waiting period for an adoptive placement exceeds one year from the date the preplacement investigation report is completed, the report must be updated before the placement of a child for the purpose of adoption to determine any change in circumstances." S.C.Code Ann. § 63–9–520(A)(1)(b).

The preplacement investigation was conducted sometime before September of 2011. Baby Girl has lived with her father in Oklahoma since December 2011—at least two years from the date of the original preplacement investigation. Because the preplacement investigation report was not updated, the adoption should not have been finalized.
Additionally, Section 63–9–520(A)(2) of the South Carolina adoption code states that: "A postplacement investigation and report of this investigation must be completed after the filing of the adoption petition. Copies of this report must be provided to the adoption petitioner and must be filed with the court at the final hearing on the adoption provided for in Section 63–9–750." *A postplacement investigation and report of this investigation must include, among other things, a determination that adoption by the adoptive parents, is in the best interest of the adoptee.* As mentioned above, Baby Girl has lived in Oklahoma for almost two years now. Any postplacement investigation report filed with the South Carolina Family Court before Baby Girl's transfer to Oklahoma in December 2011 would have considered her best interests then, **not now.**
Finally, § 63–9–520(B) states that "the investigators and all persons participating in, conducting, or associated with the preparation of reports required under this section must be available for examination and cross-examination by any party to an adoption proceeding concerning the contents of and recommendations contained in the reports." Although new reports should have been filed, Father was not given the opportunity to question the investigators about the contents

¶ 12 Ironically, the South Carolina Supreme Court refused to recognize a sister state's custody order under § 1738A(e) for failure to comply with the notice and hearing requirements of the PKPA. In *Doe v. Baby Girl,* 376 S.C. 267, 657 S.E.2d 455 (2008), one of the issues presented was whether South Carolina was required to recognize and enforce an Illinois custody determination under the PKPA. Specifically, the South Carolina Supreme Court held that the Illinois order was "flawed because [adoptive parents] were not named as parties to the Illinois actions and ***were not given proper notice and an opportunity to be heard.***" *Id.* at 464 (emphasis added). This is precisely what occurred in South Carolina in this case. Father's parental rights were terminated and a custody placement was made without giving interested parties an opportunity to be heard on the issues they had raised.[15]

¶ 13 More importantly, the South Carolina Family Court held no hearing concerning the best interests of Baby Girl and the likelihood of psychological harm to the child resulting from severance of the parent-child relationship. There was not one shred of evidence presented to indicate how such a custody transfer would affect the rights and well-being of Baby Girl. Other jurisdictions facing circumstances similar to those before us have found that a custody determination is in derogation of the PKPA when made without conducting a hearing to determine the best interests of a child.

¶ 14 In the case of *E.E.B. v. D.A.,* 89 N.J. 595, 446 A.2d 871 (1982), the New Jersey Supreme Court faced a custody dispute between prospective adoptive parents from New Jersey and a natural mother living in Ohio. The minor child at the center of this custody battle was born in Ohio on October 13, 1978. *Id.* at 873. Three days after the child's birth, the natural parents executed permanent relinquishments to custody, and the infant was placed with a county welfare department. *Id.* On October 19, 1978, the child was placed with the adoptive parents. *Id.* Mother attempted to revoke her relinquishment on October 23, 1978. *Id.* After

the county welfare agency failed to inform the Ohio Juvenile Court of mother's revocation, the assigned judge authorized the child's placement with the adoptive parents. *Id.*

¶ 15 Natural mother filed an action seeking a writ of habeas corpus for the return of her biological child. *Id.* Relief was denied by the lower court and the Ohio Court of Appeals affirmed that judgment in June of 1979. *Id.* Natural mother sought review in the Ohio Supreme Court. In October of 1979, the adoptive parents moved with the child to New Jersey. *Id.* at 874. The Ohio Supreme Court reversed the prior decisions on July 23, 1980, and remanded the matter to the Juvenile Court. *Id.* After rehearing in the Ohio Supreme Court was denied, the Juvenile Court issued a writ of habeas corpus on September 29, 1980—*without conducting a best interests hearing. Id.* at 874, 877. The adoptive parents then initiated a custody proceeding in the New Jersey court system on September 29, 1980. *Id.* at 874. Following a hearing to determine the best interests of the minor child, the lower court found she should remain in the custody of the adoptive parents. Natural mother appealed the ruling, challenging the authority of New Jersey courts to issue a custody determination and the system's failure to recognize and enforce the prior issued Ohio custody order under the PKPA.

¶ 16 The New Jersey Supreme Court recognized that the PKPA would permit modification of the Ohio order only if two conditions were met: (1) the forum/modifying state has subject matter jurisdiction; and (2) the original issuing state has either lost or declined jurisdiction. *Id.* at 877 (citing 28 U.S.C. § 1738A(f)). Because the child had been residing in New Jersey for the majority of her life, the court found the state had subject matter jurisdiction over the child. *Id.* More importantly, the court found Ohio had relinquished jurisdiction over the child when it failed to conduct a hearing to address the best interests of the child:

of the old reports because no final adoption hearing was held.

**15.** Custody Transition Order at 2 (S.C.Fam.Ct. 9th Jud. Cir. Aug. 1, 2013).

We hold that *Ohio's failure to conduct a best interest hearing constitutes a refusal to exercise jurisdiction under 28 U.S.C.A. § 1738A(f)(2).* Under PKPA, therefore, New Jersey is free to modify the Ohio decree. This result comports with the congressional intent that child custody decisions be made in the state best able to determine the best interest of the child. See Pub.L.No. 96–611, § 7, 94 Stat. 3568.

*Id.* (emphasis added); *see also People ex rel A.J.C.*, 88 P.3d 599, 612 (Colo.2004) (determining that because Missouri failed to conduct a best interests analysis in issuing its custody decree, it declined jurisdiction to modify that order under section 1738A(f)); *In re Baby Girl L.*, 2002 OK 9, ¶ 28, 51 P.3d 544 (noting that "[t]he Legislature has endeavored to avoid *serious psychological harm to children resulting from failed adoptions.*" It has sought this goal by a "best interests" hearing after the failed adoption and by applying certain requirements for temporary custody orders. How the biological parents, adoptive parents, and the courts treat the temporary custody of young children must reflect the Legislature's concern.") South Carolina's failure to conduct a best interests hearing constitutes a refusal to exercise jurisdiction under the PKPA. Baby Girl has resided in Oklahoma since December 2011, so Oklahoma has the right to exercise jurisdiction and could modify the custody determination after Baby Girl's best interests have been fully considered.

### Conclusion

¶ 17 Baby Girl deserves her day in court. We cannot ignore the fact that Baby Girl, at the age of 27 months, has already been moved from one set of "parents" to another, after lengthy judicial consideration of her best interests. Under the issues presented to this court, an immediate change of custody without **any** consideration of her best interests will require a four-year-old child to resolve her feelings of loss and grief for a second time.

---

**16.** It is hard to fathom this Court allowing the enforcement of an adoption decree entered in direct contravention of the Oklahoma and U.S. Constitutions. Our decision in *In re Baby Girl L.*, 2002 OK 9, 51 P.3d 544, recognized the right of

¶ 18 Because the courts of the state of South Carolina refused to allow a hearing on the what is in the best interests of Baby Girl and Father's parental rights were terminated without proper notice and an opportunity to be heard, I would assume original jurisdiction, stay the transfer of Baby Girl, and find that Oklahoma is not required to recognize and enforce the South Carolina adoption decree. I would consolidate the appeal from the Cherokee County habeas corpus proceeding with this proceeding and stay the transfer of Baby Girl in that case as well. I would order a hearing on the best interests of Baby Girl as required by the law of this state before any change of custody is considered.[16] *see In re Baby Girl L.*, 2002 OK 9, 51 P.3d 544.

---

*legal strangers* to assert continued custodial rights after a failed adoption; *yet we fail to protect a biological parent's right to present evidence concerning his continued custody of Baby Girl following the legal debacle that is this case.*