Filed 4/28/14  In re H.O. CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re H.O. et al., Persons Coming Under the Juvenile Court Law. | |
| MADERA COUNTY DEPARTMENT OF PUBLIC WELFARE,<br><br>Petitioner and Respondent,<br><br>v.<br><br>M.W.,<br><br>Defendant and Appellant. | F068201<br><br>(Madera Super. Ct. Nos. MJP015761, MJP016356, MJP016742 & MJP016875)<br><br>**OPINION** |

### THE COURT[*]

APPEAL from a judgment of the Superior Court of Madera County.  Thomas L. Bender, Judge.

Catherine Czar, under appointment by the Court of Appeal, for Defendant and Appellant.

---

[*] Before Cornell, Acting P.J., Poochigian, J. and Peña, J.

Douglas W. Nelson, Acting County Counsel, and Miranda P. Neal, Deputy County Counsel, for Petitioner and Respondent.

-ooOoo-

**INTRODUCTION**

Mother raises two issues on appeal from an order terminating her parental rights. First, she contends that the court failed to ensure compliance with the Indian Child Welfare Act's (ICWA) notice requirements. Second, she submits the court abused its discretion in refusing to apply the "beneficial parental relationship exception" to adoption. (Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(i).)[1]

We affirm in part and conditionally reverse in part. We conclude that ICWA's notice requirements were not followed, and conditionally reverse the order terminating parental rights. We affirm the court's ruling that the beneficial parental relationship exception (§ 366.26, subd. (c)(1)(B)(i)) does not apply.

**FACTS**

*2005–2007 Dependency*

In November 2005, the Madera County Department of Public Welfare (the Department), filed a juvenile dependency petition. (§ 300.) The petition alleged that Hav. O.,[2] a nine-month old, suffered a burn on her right forearm caused by "the acts of or omission of" Mother. The petition further alleged that Mother abused methamphetamine. Finally, the petition alleged that several dangerous items were "easily accessible" to Hav. O., including drug paraphernalia and knives.

---

[1] Subsequent undesignated statutory references are to the Welfare and Institutions Code.

[2] Several of the children in this case have the same initials. To distinguish between the various minors, we will use multiple letters of their first name.

The juvenile court sustained the petition and adjudged Hav. O. a dependent of the court. By May 2006, the social worker described Mother's progress as "significant," and concluded she was now able to provide for the safety and protection of Hav.O. On May 12, 2006, the court ordered Hav. O. returned to Mother's care.

On August 9, 2006, Mother indicated Hav. O. might be of Cherokee descent. The Department sent notice to three bands of Cherokee tribes: United Keetowah Band of Cherokee Indians, the Eastern Band of Cherokee Indians, and the Cherokee Nations. The notices were sent in mid-August 2006. The notice contained information regarding Mother and Hav. O.'s father, Christian O., but no information concerning other relatives.

By September 2006, all three bands of Cherokee had responded. The United Keetoowah Band of Cherokee Indians indicated that, upon review of their records, there was no evidence Hav. O. is a descendant from anyone on the Keetoowah roll. The Eastern Band of Cherokee Indians indicated that, based on the information they had received, Hav. O. was neither registered nor eligible to register as a member of the tribe. The Cherokee Nations indicated that, based on the information provided, Hav. O. would "not be considered an 'Indian child[]' in relationship to the Cherokee Nation." On September 27, 2006, the court found that ICWA did not apply.

By March 2007, the social worker had concluded that Mother had "demonstrated that she has the capability of remaining drug free and the ability to care for her child." The court dismissed the dependency proceedings on March 27, 2007.

*2009 Dependency Proceedings*

On February 24, 2009, the Department filed another juvenile dependency petition. (§ 300.) The petition alleged that Hav. O., now three years old, and Hal. O., 18 months old, came under section 300, subdivisions (b) and (g). Specifically, the petition alleged that Mother admitted to using methamphetamine in February 2009. Mother was arrested on February 5, 2009, and booked into jail on charges of theft (Pen. Code, § 484g) and

3.

receiving stolen property (Pen. Code, § 496, subd. (a)).  The petition alleged that as a result of Mother's incarceration, the two children were left without support.

Mother executed a Parental Notification of Indian Status (Form ICWA-020), indicating that Mother "may have" Cherokee ancestry.  At the detention hearing on February 10, 2009, the court asked Mother whether she had any "American Indian heritage in [her] background."  She initially said she did not "think" she had Indian heritage.  But shortly thereafter, Mother said her parents were Apache "[a]nd Cherokee." Then, the following exchange occurred between the court and county counsel:

> "THE COURT:  Okay.  All right.  Well, I'll find ICWA may apply here.
>
> "MS. NEAL [Department's counsel]:  Your Honor, you wanted also to send out a new notice not relying on the old case that we have had because there's a companion case.
>
> "THE COURT:  Yes, I figured that one case was one of – was older. Hav[.] or Hav[.] had the lower number.  I figured that was an older case.
>
> "MS. Neal:  We had Hav[.] in dependency Court.  That wasn't – that case was eventually dismissed.
>
> "THE COURT:  I don't know.  I do have the old case. *I would send out new notices just to be on the safe side*."  (Italics added.)

The Department's jurisdiction report dated March 5, 2009, requested a finding that ICWA does not apply based on the court's previous finding in the 2005–2007 dependency case.  There is no indication that additional notices had been sent after the court recommended doing so at the detention hearing.

At the jurisdiction hearing on March 5, 2009, the court noted that Mother was present in court.  Later in the hearing, the court said, "The mother appeared.  She denied any Indian heritage."  The reporter's transcript contains no indication that Mother had

4.

spoken at the hearing prior to the court's comment.[3]  The court noted that "[n]o persons have suggested that the father has any Indian heritage.  It does not apply."  The court assumed jurisdiction over Hav. O. and Hal. O.

At the disposition hearing on March 26, 2009, the court ordered the children removed from Mother's custody.  The court found that Mother had not "participated regularly in the initial case plan."  But by September 2009, the Department concluded that Mother had "made significant progress in resolving problems that led to her children's removal from her home."  The Department recommended that Hav. O. and Hal. O. be returned to Mother's custody.  On September 24, 2009, the court granted the Department discretion to place the children with Mother.

On October 1, 2009, the court held an uncontested review hearing.  Hav. O. and Hal. O's alleged father, Christian O., appeared at the hearing in custody.  Christian O. said he had Native American ancestry through his father but was not a member of a tribe. He identified the "Chiricahua and Mescalera Apache in [the] White Sands [R]eservation."  The court found that ICWA "may apply" and said the Department "should give notice to the tribes."  The court also found that Christian O. was the presumed father of Hav. O. and Hal. O.

On October 2, 2009, Christian O. filed a Parental Notification of Indian Status (Form ICWA-020).  Christian O. indicated that both he and his children may be eligible for membership in "Apache Chiwocawa WHITE SANDS RESERVATION."  He also indicated that one or more of his lineal ancestors "is or was" a member of a federally recognized tribe.

Mother gave birth to minor Pr. P. in January 2011.  A status review report dated March 17, 2011 indicated that Mother was re-enrolled in a drug abuse counseling

---

[3] Perhaps the court held off-the-record proceedings immediately prior and was simply recounting those proceedings.

program with Family Treatment Center.[4]  But, Mother had repeatedly missed Narcotics Anonymous (NA) meetings.  Mother claimed her absences were due to the fact she had recently given birth.  Mother's two random drug tests had come back negative.  An addendum report dated April 5, 2011, indicated that Mother had been discharged from her outpatient drug program due to "excessive absences."

On June 16, 2011, the Department filed a supplemental petition as to Hav. O. and Hal. O (§ 387) and an original petition as to Pr. P.  (§ 300).  The June 2011 petitions alleged Mother tested positive for methamphetamine on June 8, 2011.  They further alleged that Mother admitted relapsing.  Pr. P.'s father, Aaron P., admitted to using methamphetamine with Mother since March 2011.  Aaron P. said "he felt he and [Mother] were unable and not fit to care for their child, Pr. P., as well as … [Hal. O. and Hav. O.] due to their on[-]going substance abuse issues."

At the detention hearing on June 17, 2011, the following exchange occurred between counsel and the court:

> "THE COURT:  I've read the reports with respect to Indian child eligibility.  From the position of the mother at this time, are any of the three childs [*sic*] eligible for designation as [an] Indian child?
>
> "MR. PENTELL [Mother's counsel]:  Your Honor, [Mother] is stating that as to [Hav. O. and Hal O.], there may be Apache eligibility enrollment.  Their grandfather was an enrolled member in the Apache tribe.  It's never been followed up on, so it's – not sure if they are eligible for enrollment or not, if the tribe was to accept them.
>
> "THE COURT:  All right.  Mr. Whitford [Department's counsel], you had a comment on that issue?
>
> "MR. WHITFORD:  I was just looking at the prior reports on ICWA and I had seen that the Department had checked out the requests of a number of

---

[4] This report contained several dates that are apparently incorrect.  The report lists Mother's re-enrollment date as August 20, 2011, though the report itself was filed in March 2011.  Several similar errors appear in the report.

the Cherokee bands that [Mother] had indicated earlier. But I don't see anything about Apache, so we can follow up on that.

"THE COURT: All right. I will ask the Department to follow up on that. [¶] Ms. Mitchell [fathers' counsel], with respect to [Aaron P.], any comment with respect to possible Indian heritage?

"MS. MITCHELL: He does not claim any, Your Honor.

"MR. PENTELL: Your Honor, if I could clarify as to the ICWA Apache issue, that would be as to [Christian O.], so it would be paternal grandfather that she believes is the possibility of enrollment in Apache tribe.

"THE COURT: I know that has been reviewed at earlier hearings. And it seems, though, that the report indicated it was not – earlier, that the Court had found that there was not an ICWA finding to be made. But, again, I do want them to look into it based upon this new consideration."

The court stated that Mother denied "Indian heritage with respect to [Pr. P.]." The court found that ICWA did not apply to Pr. P.

At a hearing on August 4, 2011, Department's counsel stated: "Now that the children are out of the home, I think that we need to follow up on ICWA regarding [Christian O.][5] I'd like to find him, because he contacted the Department in June, and he said he wanted his kids, and then nobody followed up on that." At the hearing, Mother said she has Native American ancestry on her mother's side. Mother's own mother, Betty G. spoke at the hearing. Betty said her own grandmother was "half Cherokee." Betty said she "suppose[d]" she was eligible for membership with the Cherokee tribe but had "never pursued it or anything." The court asked whether Betty's grandmother was a member of the Cherokee tribe. Betty said that her grandmother had never "claimed" Cherokee heritage, as far as she knew. Betty said she "believe[d]" the tribe was located in Oklahoma.

---

**5** Appellant's brief attributes this statement to the court. But the reporter's transcript attributes the statement to counsel for the Department.

During the August 4, 2011, hearing, Mother said Christian O.'s grandfather "is a hundred percent Apache." Mother said the tribe was located in Oklahoma. She also said that Christian O.'s grandfather was "registered" and "had a number."

Later, at the August 4, 2011, hearing, Department's counsel conceded that the Department "probably" needed to send notice to the Apache tribes. The court said, "That's what I would do. That's the safest thing, even if you can't find [Christian O.'s father]." Later in the hearing, the court said the Department could contact Christian O.'s father about Christian O's whereabouts and his Native American ancestry. The court said it was important for the Department to follow up with Christian O.'s parents.

In an order dated August 4, the court sustained the petitions and ordered Hav. O., Hal. O., and Pr. P., detained.

On August 17, 2011, the social worker spoke with Christian O.'s parents. Christian O.'s parents said there must have been a "mistake" because their entire family was solely from Mexico and that "they have no North American Indian ancestry." The Department requested that the court find ICWA does not apply "[b]ased on the new information obtained from the paternal grandparents" (i.e., Christian O.'s parents). On September 8, 2011, the court found that ICWA does not apply to any of the children.

A status review report dated March 23, 2012, indicated that Mother completed a residential substance abuse program and had begun an outpatient program thereafter. The report also indicated that Hal. O. "struggled with … grief … as it relates to being removed from her parents" but was generally happy. Hav. O. was participating in counseling and was making progress in managing anxiety and outbursts.[6] Pr. P. appeared "emotionally connected" with Mother and had frequent visits with her. The report also indicated that Mother had recently given birth to another child, Pe. P.

---

[6] Appellant cites the report and suggests that Hav. O.'s anxiety and outbursts were attributed to her removal from Mother. However, the cited portion of the record does not identify the cause of Hav. O.'s anxiety and outbursts.

Beginning in March 2012, Mother was set to begin biweekly overnight visits with the children. The report described the children as having "positive interaction" with Mother during the visits. The social worker noted that Mother "sometimes" failed to communicate direct expectations and instead "bargain[ed]" with the children. The Department recommended continuing reunification services for Mother.

On May 23, 2012, the Department filed a juvenile dependency petition with respect to Pe. P., who was four months old. The petition alleged that Mother had tested positive for methamphetamine on May 14, 2012. The test results indicated a "strong" concentration of methamphetamine. Additionally, one of Mother's substance abuse service providers reported that Mother's attendance was inconsistent and that when she did attend her participation had become "off the wall." The court sustained the petition.

In July 2012, Pe. P. tested positive for drugs at "twice the adult cut off levels for methamphetamine at 960pg/mg."

A status review report dated in September 2012 explained that Mother was homeless and unemployed. The report said that Mother had relapsed and could not maintain the children safely in her care. Mother had also failed to appear for a mental health assessment and would not reschedule the appointment. However, Mother was consistently attending weekly two-hour supervised visitations with her children at the Department.

The Department requested that the court terminate reunification services as to Hav. O., Hal. O., and Pr. P., and deny reunification services as to Pe. P. under section 361.5, subdivision (b)(13). At two separate hearings in September 2012, the court granted the Department's requests. A section 366.26 hearing was set as to all four children for January 22, 2013.

The Department prepared a report ahead of the section 366.26 hearing. (See § 366.21, subd. (i).) With respect to the children's relationship with Mother, the report said:

9.

"[The four children] do not share a substantial, positive, emotional attachment with their parents. The children do not ask for their parents when they are not present nor do they look to their parents to meet their needs. The chaotic nature of the visits with their mother … indicates a disorganized attachment to her rather than a healthy one.… Through no fault of their own, the children have been unable to develop a healthy, positive, parent-child relationship with [Mother] or their respective fathers[.]"

The report noted that pending the section 366.26 hearing, visitations had continued. It described the visits as "chaotic" without "a healthy bond between the mother and the four [children]." The report noted Mother "demonstrated poor ability" to "engage her children." !(CT 1242)! The report acknowledged that the children "appear to enjoy their visitation time with [Mother]."

The Department interviewed Hav. O. and Hal. O. "concerning their attitude toward placement and adoption." The report concluded that "[a]lthough adoption was explained in an age-appropriate manner it is clear [the two girls] do not fully understand as they have had fantasies about returning home to the care of their mother."

On January 22, 2013, the court continued the section 366.26 hearing to July 15, 2013, so that an adoptive family could be located.

The Department prepared a status report dated in March 2013. The report noted that a prospective adoptive home had been found. Therefore, the Department recommended that Mother's visitation with the children be reduced to once per month. The report described Mother's supervised visits with the children: "Supervised visitations have been observed to be optimistic as mother and children engage each other through some playing activities."

On March 18, 2013, the court granted the Department the discretion to determine the frequency of Mother's visits with the children.

In a report dated in July 2013, the Department described recent visits between Mother and the children. Mother arrived late to a visit on April 3, 2013. She picked up Pe. P., but "was not equally attentive to the other children." Mother had brought a dog to

10.

a visit on March 6, 2013, even though they are not allowed in the building. Mother was also late to a visit on May 1, 2013, and again had brought a dog with her. She was told that animals are not allowed in the building. Mother began to cry, which upset all of the children, who also began crying. Prior to Mother's late arrival, the children had been playing and laughing with their grandmother.

At one visit, Mother asked the children what they would call the care providers. Hav. O. replied, "[T]hat's my dad." Mother "corrected" her and said, "that is '[J.].' " At the end of a later visit, Mother said, "I do not think that [J.] is a nice guy."

The report also described a visit where Mother took Hav. O. and Hal. O. to the bathroom and "locked the [social worker] out of the restroom." The social worker overheard part of their conversion. Mother asked the children, "[I]s that going to be your guys' new home?" The children replied, "Miss [L.] said this could be our forever home." Mother replied, "NO. You can't live with me now but the judge ordered for me to have six more months to get you back."

At the most recent visit on July 3, 2013, Mother brought nail polish and Sharpie markers for the girls. Later in the visit, Pe. P. and Pr. P. were walking around unsupervised with the open bottle of nail polish and an open Sharpie pen. The report noted that during visits, Hal. O. and Pr. P. would "play off by themselves."

The report concluded that Mother "does not show any evidence of a positive parent[-]child relationship with [the four children]."

The contested section 366.26 hearing was ultimately held on August 6 and 13, 2013. Adoption social worker Lilly Spees testified at the hearing. Spees has a Bachelors degree in psychology and a Masters degree in social work. She assessed the children and determined they were adoptable. In her opinion, no "exception[s] to adoption" applied. Spees referenced the "chaotic" nature of Mother's visits with the children. She also explained that some of the children were "off not really engaging with" Mother during

the visits. Spees also noted that Mother was providing "unhealthy snacks" to the children. Spees described the ongoing visitations as "negative."

Spees acknowledged that the children loved their Mother and were excited to see her during visitation. Spees also said that the children did not know that visitation with Mother might be discontinued. Accordingly, she did not know how the children would react if visitation was to be discontinued.

Mother also testified at the contested hearing. Mother said she had consistently attended her scheduled visits with her children. She said the girls were excited to see her at visits and called her "mom" or "mommy." During the visits, she would draw and paint with the children. She was affectionate with the girls, hugging and kissing them. Mother recounted keeping Pe. P. with herself for the full duration of most visits. Mother felt the girls benefitted from seeing her because it was "normal" and "something they're used to." She felt that once the visitation frequency was reduced, the girls quit expressing how they feel in front of the social worker. It gave Mother the impression that girls were not comfortable saying "things" in front of the social worker, "like they're going to get in trouble."

Mother said that from what she understood, "it was supposed to be an open adoption to where I would get to see them every once in a while. What they told my mom … she could even get them on weekends." Hav. O. had told Mother that she would be able to see her when she was 18 years old. Mother was asked why it would hurt the girls if they were unable to see her. She replied, "Because I'm their mom. And why it would hurt them, it's hard to answer, um." Mother felt that the children "look at [her] for their morals and their beliefs."

The court terminated Mother's parental rights and found that no "beneficial relationship exception … exists." Mother appeals.

**DISCUSSION**

I.  SUBSTANTIAL EVIDENCE SUPPORTS THE COURT'S FINDING
    THAT THE BENEFICIAL RELATIONSHIP EXCEPTION DOES NOT
    APPLY

Section 366.26, subdivision (c)(1)(B)(i) provides that the "court shall terminate parental rights unless … [t]he court finds a compelling reason for determining that termination would be detrimental to the child [because the] parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subds. (c)(1) & (c)(1)(B) & (c)(1)(B)(i).)  Mother claims the court erred in finding this statute did not apply.  We disagree.

"[W]hen the court has not returned an adoptable child to the parent's custody and has terminated reunification services, adoption becomes the presumptive permanent plan and parental rights should ordinarily be terminated at the section 366.26 hearing.  The parent has the burden of proving that termination would be detrimental to the child under section 366.26, subdivision (c)(1)(A).[7]  [Citations.]  The juvenile court may reject the parent's claim simply by finding that the relationship maintained during visitation does not benefit the child significantly enough to outweigh the strong preference for adoption." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350.)  "Because a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*Ibid.*)

Here, there was sufficient evidence to conclude that "the relationship maintained during visitation does not benefit the child significantly enough to outweigh the strong preference for adoption." (*In re Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1350.)  The Department's assessment that Mother's visits with the children were "negative" is

_____

**7** Former section 366.26, subdivision (c)(1)(A) is now section 366.26, subdivision (c)(1)(B)(i).  (*In re S.B.* (2008) 164 Cal.App.4th 289, 292, fn. 2.)

13.

supported by the various incidents that occurred during visits as outlined in the Department's July 2013 report. That report noted that Hal. O. and Pr. P. would "play off by themselves" during visits. The social worker's testimony at the hearing reiterated that some of the children were "off not really engaging with" Mother during the visits. A July 2013 report described a visit where Mother took Hav. O. and Hal. O. to the bathroom and "locked the [social worker] out."

Mother argues on appeal that she is "a positive role model" for the children. However, there was substantial evidence that Mother was not a positive role model for her children. Mother repeatedly relapsed into drug use despite being given several opportunities. She also demeaned or undermined people around her including the social worker and the adoptive parents.

We acknowledge Mother's evidence that she was affectionate toward the children, and that they were excited to see her at visits. However, the evidence we cited above supports an inference that her relationship with the children did not benefit them enough to outweigh the strong preference for adoption. Therefore, Mother cannot defeat adoption "simply by demonstrating some benefit to the child from a continued relationship … or some detriment from termination of parental rights." (*In re Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1349.)

The court's ruling that "there's no beneficial relationship exception that exists in this case" is affirmed.

II.     ICWA

Mother also claims that the Department failed to comply with ICWA notice requirements. We agree.

ICWA requires notice of dependency proceedings be sent to relevant tribes whenever the court knows or has reason to know that an Indian child is involved. (*In re D.N.* (2013) 218 Cal.App.4th 1246, 1251. See also 25 U.S.C. § 1912, subd. (a).)

14.

As noted above, the Department sent ICWA notices to three Cherokee bands in 2006, during the prior dependency case. These were the only ICWA notices sent in either dependency case, even though the court repeatedly advised new notices be sent in the latter case. In the dependency court, the Department maintained that the 2006 notices satisfied ICWA notice requirements for all four children in the subsequent dependency case. We disagree for several reasons which we will now explain.

A. Failure to Send ICWA Notice With Respect to Hal. O., Pr. P., and Pe. P.

ICWA notices must include the subject child's name. (See *In re K.M.* (2009) 172 Cal.App.4th 115, 119.) The 2006 notices only included Hav. O.'s name, as the other three children had not even been born yet. Thus, no ICWA notices bearing the names Hal. O, Pe. P. or Pr. P. were ever sent even though Mother claimed Native American ancestry. At an August 4, 2011, hearing, Mother said she had Native American ancestry on her "mom's side." !(8 RT 2108)! Additionally, her parental notification forms indicated she may have Cherokee ancestry. Therefore, ICWA notices should have been sent naming Hal. O., Pr. P., and Pe. P.

B. Failure to Notice any Apache Tribes

"Formal notice of the proceedings must be sent to *all* tribes in which the minor may be eligible for membership. [Citations.]" (*In re Desiree F.* (2000) 83 Cal.App.4th 460, 475–476, original italics; see also § 224.2, subd. (a)(3) ["Notice shall be sent to *all* tribes of which the child may be a member or eligible for membership…" (Italics added.)].) "Notice to one tribe … does not protect the rights of another interested Indian tribe. [Citation.]" (*In re Desiree F.*, *supra*, 83 Cal.App.4th at p. 476.)

Here, no notices were sent to any Apache tribes despite some evidence suggesting the children had Apache ancestry. The Department contends that the information regarding the children's Indian status "was always vague" and therefore insufficient to trigger ICWA's notice requirements. We disagree. At the February 10, 2009, detention hearing Mother said: "My parents are Apache." And Christian O.'s Parental

15.

Notifications of Indian Status expressly stated that Hal. O. and Hav. O. were "members[s] of, or eligible for membership in" the "Apache Chiwocawa" tribe. There is nothing vague about these statements of ancestry.[8] We agree that ICWA notice requirements are not triggered by a mere modicum of speculative evidence regarding the possibility of unspecified Indian heritage. (See *In re O.K.* (2003) 106 Cal.App.4th 152, 157.) But here, Christian O. unequivocally asserted Indian heritage in a specific tribe. And Mother inconsistently claimed Apache and Cherokee ancestry. This evidence did not conclusively prove Indian heritage, but it did "suggest" Indian ancestry. Therefore, it was sufficient to trigger ICWA's notice requirements. (See *In re Nikki R.* (2003) 106 Cal.App.4th 844, 848.)

Perhaps the Department means to argue not that the evidence was speculative, but that there was *conflicting* evidence regarding children's potential Indian heritage. If so, we would agree. Christian O.'s parents said they have no North American Indian ancestry, which conflicts with Christian O.'s claims of Indian ancestry. Also, some of Mother's statements regarding her own ancestry were contradictory. But a conflict in the evidence does not excuse the failure to provide ICWA notice. "Given the interests protected by the Act, the recommendations of the guidelines, and the requirements of our court rules, the bar is indeed very low to trigger ICWA notice." (*In re Antoinette S.* (2002) 104 Cal.App.4th 1401, 1408.) California courts have held a "minimal showing" (*Dwayne P. v. Superior Court* (2002) 103 Cal.App.4th 247, 258) that merely "suggest[s]" Indian ancestry is all that is required to trigger ICWA's notice requirements. (*In re Nikki R.*, *supra*, 106 Cal.App.4th at p. 848; see also *Antoinette S.*, *supra*, 104 Cal.App.4th at

---

[8] The Department cites *In re Jeremiah G.* (2009) 172 Cal.App.4th 1514 (*Jeremiah G.*) in arguing it had no duty to provide ICWA notices in the latter dependency case. But in *Jeremiah G.*, "there was no information that reasonably would suggest [the child] had Indian heritage." (*Id.* at p. 1521.) Here, there was information that would reasonably suggest the children had Indian heritage.

p. 1408; *Dwayne P.*, *supra*, 103 Cal.App.4th at p 258.) Notwithstanding the conflicting evidence, Mother's statements and Christian O.'s parental notification form created more than a "suggestion of Indian ancestry." (*In re Nikki R.*, *supra*, 106 Cal.App.4th at p. 848.)

The Department argues that because Christian O.'s status was reduced from "presumed father" to "alleged father," "any ICWA issue [is] moot." !(RB 5)! We disagree. First, we doubt that Christian O.'s classification as a "presumed" or "alleged" parent under California law has any direct bearing on whether he is a "parent" under ICWA. (See *Adoptive Couple v. Baby Girl* (2013) ___ U.S. ___ [133 S.Ct. 2552, 2574] (Sotomayor, J., dissenting). But cf. *In re Daniel M.* (2003) 110 Cal.App.4th 703, 708–709.) Second, there was evidence the children had Apache and Cherokee ancestry through Mother. Therefore, even if Christian O.'s Native American ancestry were entirely irrelevant, ICWA notice requirements were still triggered by the evidence of Mother's possible Native American ancestry.

## CONCLUSION

In sum, the Department should have adhered to the court's suggestions regarding ICWA notice. Ensuring compliance with ICWA is the responsibility of both the dependency court and the Department. (*Justin L. v. Superior Court* (2008) 165 Cal.App.4th 1406, 1410.) On at least three separate occasions, the court indicated the Department should send out ICWA notices. As early as February 2009, the court said, "I would send out new notices just to be on the safe side." On October 1, 2009, the court said, "The Department should give notice to the tribes." Yet, by August 2011, no notices had been sent. On August 4, 2011, the Department's own counsel said, "[W]e probably just need to send out notice to the [] Apache tribes." It is unfortunate that the ICWA notices were not sent. As a result, we must conditionally reverse.

17.

## DISPOSITION

The order terminating parental rights is conditionally reversed. The dependency court is directed to order the Department to provide ICWA notice to Apache and Cherokee tribes for each of the four children. If a tribe intervenes, the court shall proceed in accordance with ICWA. If no tribes intervene after receiving proper notice, the order terminating Mother's parental rights shall be reinstated. (See *In re A.G.* (2012) 204 Cal.App.4th 1390, 1402.)